# CHARLESTON.

W. C. CAMPBELL *et als.* v. LUCY J. LYNCH *et als.*

Submitted November 14, 1917.   Decided November 20, 1917.

1. PARTITION—*Rights of Partitioners—Mineral Royalties.*

    Partition among coparceners of a tract of land on which there is a subsisting oil and gas lease executed by their ancestor in his lifetime, and assignment of dower therein to the widow, before any wells have been drilled on the land, by a decree in which neither the lease nor the royalties and rents provided by it are mentioned, founded upon pleadings silent as to the lease and rights created by it, does not extend to nor include such royalties and rentals, and the owner of each lot assigned therein is entitled to a proportionate share of all the royalties and rentals accruing from all the wells drilled on the entire tract of land embraced in the lease, subject to the widow's right of dower therein.   (p. 377).

2. DOWER—*Mineral Royalties—Extent.*

    In such case, the wells drilled by the lessee on the portion of the land assigned to the widow, as and for her dower, are not mines or wells worked by her, since the working right is held by the lessee, even though they may be deemed to be mines opened in the husband's lifetime; and she is not entitled to the entire royalties and rents accruing from such wells, nor is her dower right limited to such royalties and rentals as subjects thereof. She is entitled to dower, whatever its extent may be, in all the royalties and rents accruing from all the wells drilled on the entire tract of land covered by the lease.   (p. 384).

3. MINES AND MINERALS—*Oil and Gas Lease—Interest of Lessee.*

    An oil and gas lease vests in the lessee, an estate in the oil and gas in the land embraced by it, on his discovery thereof, but it neither vests title to such minerals in place, in him, nor effects

a severance of the title thereto from the title to the land. The subject of the lessee's title is the incorporeal right of mining or extracting the oil and gas.  (p. 377).

4.  DOWER—*Leasehold Reversion—Rent.*

   If the land of which a husband dies seized is subject to a valid lease at the time of his death, yielding a rental, the widow is dowable of the reversion and the rent as an incident of the reversion.  (p. 384).

   (RITZ and MILLER, JUDGES, dissenting.)

Appeal from Circuit Court, Roane County.

Bill in equity for discovery and accounting by W. C. Campbell and others against Lucy J. Lynch and others.  Decree for defendants, and plaintiffs appeal.

       *Reversed, demurrer overruled, cause remanded.*

*Charles E. Hogg, J. F. Cook* and *J. W. Kennedy,* for appellants.

*Harper & Baker, R. G. Altizer, A. B. Fleming, Chas. Powell* and *Kemble White,* for appellees.

POFFENBARGER, JUDGE:

The complaint on this appeal goes to the dismissal of a bill in equity, praying discovery and an accounting as to oil and gas obtained from two tracts of land, under leases thereof on several demurrers interposed thereto.

The two tracts of land were owned by Edward Lewis, now deceased, and were leased by him to the South Penn Oil Company, by separate leases, in his lifetime.  In each lease, there is a reservation of the usual oil royalty, one-eighth, and a covenant to pay $200.00 annually for the gas from each gas well.  In June, 1902, Lewis died, leaving him surviving his wife and six children, two sons and four daughters.  One of the daughters, Prudentia Campbell, died in 1905, leaving six children and her husband surviving her.  In 1906, the two tracts of land, subject to the leases, were partitioned by judicial proceedings, and assignments made as follows: Lot No. 1, containing 200 acres to the widow, Mary M. Lewis, as and for her dower; Lot No. 2, containing 60 acres, to Lucy J.

Lynch; Lot No. 3, containing 74 acres, to James McC. Lewis; Lot No. 4, containing 80 acres, to Fannie M. Simpson; Lot No. 5, containing 95 acres, to Mae L. Goad; Lot No. 6, consisting of two parcels, 52 acres and 30 acres, total 82 acres, to the husband and heirs of Prudentia Campbell, deceased; and Lot No. 7, containing 90 acres to John E. Lewis and F. W. Abney, his grantee.

Meantime, the leases had been kept alive by payment of delay rentals, but no wells had been drilled under them. After the partition was consummated, operations under the leases were commenced, and, at the date of the filing of the bill, numerous producing wells had been drilled, one or more on each of the lots except No. 6 assigned to the Campbell heirs. On it, no well had been drilled. The purpose of the bill filed by W. C. Campbell, life tenant of said Lot No. 6, and his six children, the reversioners, three of them infants suing by him as their next friend, is to obtain shares of the oil royalties and gas rentals from the wells on the other lots, on the theory of right to apportionment thereof, without reference to the lots on which the wells are located.

Demurrers were interposed by the lessee, the South Penn Oil Company, the United Fuel Gas Company, its assignee of the gas right under the leases, the Eureka Pipe Line Company, into whose lines the oil deliveries are made, the widow, the living children of Edward Lewis, save John E. Lewis, and F. W. Abney, grantee of John E. Lewis, all of which were sustained and the bill dismissed.

Postponement of consideration of the rights of the life tenants, particularly that of the widow, until after disposition of the conflicting claims of the heirs, will tend to simplify the questions at issue and free from complication the reasoning by which the conclusion as to the principal right involved is reached. As to the heirs holding by partition, separate and distinct parts of a tract of land on which oil and gas wells have been drilled under a lease executed by their ancestor, after his death and the partition, the controlling question is whether the royalty from each well goes, by operation of law, or by virtue of the decree of partition, to the owner of the lot on which the well yielding it happens to be.

The argument submitted for the negative of this question proceeds largely upon the view that the lease effected a severance of the oil and gas in the land from the surface and vested title thereto in the lessee, wherefore it could not have been partitioned and was not.   Though there are several judicial declarations that such a lease constitutes a virtual sale of the oil and gas, there are, perhaps, just as many or more to the effect that it does not pass any title, legal or equitable, to the oil and gas in place.   All agree that, after discovery of the minerals, it vests a conditional estate in the lessee, but it is not title to the minerals in place.   It is an incorporeal right to mine, the exercise of which may exhaust the minerals.   This right, of course, is beyond the control of the lessor, his heirs or assigns, as long as the conditions upon which it depends are complied with, wherefore it binds the lands in the hands of the lessor and all persons holding under him.   At the same time, if productive, it yields royalties which this court and others say are, in legal effect, rents.   Notwithstanding the high character of the right vested by discovery of minerals, the lessor and lessee are everywhere held to be landlord and tenant, wherefore the former must be deemed the owner of the mines and the latter the tenant.   A scientific or abstractly judicial view of the subject might reveal inaccuracies in all of these definitions.   To call the lessee a tenant, is amply sufficient for some purposes, but he may have a right in addition to that of tenancy.   The lessor may be an owner and yet have only a limited, qualified or encumbered estate.   So a right may produce ultimately some of the results of a sale of the minerals and yet not be a sale.   Whatever the right of the lessee may be, when accurately defined, he is not the owner of the oil and gas in place, and the lease does not sever the minerals from the surface.   As to that, the decisions in every jurisdiction are uniform, even though some apparently inconsistent expressions may be found in them.   However, the lease vests an estate, potential until discovery of minerals and actual afterwards, and that estate carries right to exhaust the minerals.

On the death of the ancestor, the land descended to the heirs, burdened by this right in the lessee.   It was complete

master of the situation *quo ad* the oil and gas, having right to drill where it.would on each of the two tracts, and the partition in no way affected its right or liberty in that respect. Taking the land in this condition, the heirs had right of partition thereof and a proper demand for it by one of them could not have been defeated by the others. Partition was made upon pleadings and by a decree which are wholly silent as to the leases and the rights created by them, just as lands subject to such leases are often divided by deeds silent as to the leases. On the one hand, it is contended that the oil and gas were not divided because they had been severed from the land by the leases, and, on the other, that they were divided because there had been no such severance. Though there had been no actual severance in law or fact, there may have been a potential one sufficient in law to preclude right of partition, but whether there was or not, is an academic, rather than a practical, question, determination whereof is unnecessary. If there was a division of the minerals in respect of the title, it does not necessarily follow that the royalties go with the ownership of the minerals, in the manner claimed.

That the lease on a single tract of land broken up into several sub-divisions by a partition or by conveyances, is not segregated and converted into as many distinct leases as there are sub-divisions, is conceded. That could be done only with the consent and co-operation of the lessee. As to him, the lease and its subject, the tract of land, are entireties. After as well as before the division, there is one lease of one tract, yielding, when productive, one royalty or rental in the aggregate. The subject of the lease is divisible, just as a tract of land subject to any other lease is, and so is the royalty or rent, in the manner in which other rents are apportionable. The rent is an entire thing arising out of the whole tract of land. Though the royalty oil or gas rental comes from a certain well or certain wells, it is not legally the rent or return of the wells or the severed tract of land on which they are located. It is rent of the whole tract covered by the lease. Production and delivery or payment thereof maintain the lessee's hold upon the entire tract. Mere sale or conveyance of the portion of the tract on which the well is, without a

special provision or contract touching the royalty, whether before or after the drilling, cannot change the character of the lease or the rent. In legal contemplation, the wells are not drilled on the severed portions, as under a lease of that portion. . They are drilled under the lease as made, which binds and holds all of the parts, after division, as it did before.

The royalty is a separate and distinct entity. It is not the land nor the land title. It is a wholly different thing from either and is complete in itself, notwithstanding it comes from the land. People buy and sell it as they do other rights, without alteration or disturbance of the land title, the lease or operations under the lease. Though a complete thing, it is susceptible of legal division. It is the fruit of a burden upon the title created by a covenant running with the land. An owner of a tract of land subject to such a burden, may sell and convey the land and retain the royalty, or sell the royalty and keep the land. If he conveys the whole tract and does not reserve, or stipulate for, the royalty, it passes with the land to his grantee, but, if he sells only a part of the land, the situation is altogether different, as will be shown. These illustrations of legal methods of dealing with royalties and their susceptibilities, prove them to be what I have called them, separate and distinct entities, not legally inherent in, nor annexed to the title to the land, but capable of being held and enjoyed by the holder of the title. The royalty itself embraces the element of title, but it is its own title, not the land title, and the same person may hold both. His conveyance of the land title does not necessarily include the other. Being no part of the subject matter of a contract of purchase, it does not lie in the direct course or path of the contract, wherefore it may or may not have been included. At the most, it is only collateral to the subject matter. When the contract includes it, it does so only presumptively, and the presumption rests merely on equity and justice in the interpretation of the contract or conveyance, or in the law applicable thereto. If there is a situation or circumstance raising an opposing or conflicting equity, it repels the presumption and only the title to the land passes, the thing expressly contracted for. Nothing is added to it by implication. The

doctrine of subjacent-support illustrates the principle. A sale of the coal under a tract of land does not vest right in the vendee to take out such portions of it as are necessary to the support of the surface. There is an implied exception from the grant, because it is equitable and just and in accord with presumed intention. As the royalty cannot pass to the owner of a sub-division, as is claimed, without injustice and oppression to the owners of the others, there is a presumption against it, wherefore it is deemed not to have passed with his acquisition of the land, unless his contract expressly included it.

A decree dividing land subject to such a burden yielding an equivalent return, without mention thereof, based upon pleadings wholly silent as to them, must be construed as deeds effecting a division, without terms applicable to the lease or the royalties. These subjects are not necessarily included in the decree or affected by it, because they are collateral' and do not necessarily fall within its scope or course. That judgments and decrees are to be construed with reference to the pleadings, when there is doubt as to their meaning, is elementary and fundamental. Moreover, a judgment or decree does not, ordinarily, have any force or effect beyond the subject matter of the pleadings. Again, there is no conceivable reason why the law, in the absence of provision to the contrary, should not be permitted to define the rights of parties to a decree or judgment, when it is silent as to a matter concerning which it might have spoken. "If a reversion is severed by the death of the lessor and the consequent descent to his heirs at law, the rent will thereby be apportioned, and each of the heirs may separately bring actions for his proportion." Freeman, Coten. & Par., sec. 346, *Cole* v. *Patterson*, 25 Wend. (N. Y.) 457; *Reed* v. *Ward*, 22 Pa. St. 149; *Crosby* v. *Loop*, 13 Ill. 627. Likewise, there is an apportionment when the reversion is broken up by a grant or devise thereof to two or more persons. Freeman, Coten. & Par., sec. 346. The construction of any instrument ought to be broad enough to make it operate justly and fairly under all the conditions to which it may apply. This is a cardinal rule of construction. It applies to constitutions, 8 Cyc. 733, 6 Am. & Eng. Ency.

L. 924, 6 R. C. L. 50, statutes, 26 Am. & Eng. Ency. L. 648, 36 Cyc. 1112, and contracts. 9 Cyc. 587; 17 Am. & Eng. Ency. L. 18; 6 R. C. L. 841. We are not told why it does not apply here. Whether the question is determinable by law or contract, the problem for the court is one of interpretation and construction. When a court makes the law of a case, as it is often compelled to do, it does not close its eyes to considerations of equity, fairness and reason. Nor does it do so in construing a contract. It will neither make a rankly unjust law nor place an unjust construction upon a contract, unless the terms thereof compel it to do so. In either case, strong and manifest equities must be recognized and allowed force and operation. A lessor conveying away the whole of the leased premises, presumptively intends to pass, and his grantee presumptively expects to obtain, the entire rent, for the former shifts from himself, and the latter takes, the entire burden of the lease. Enforcement of these presumptions, in the construction of their contract, effects a complete reciprocity of benefit and burden. A law declared by the court ought to do likewise. A conveyance of only a part of the premises raises no such presumption of intention as to either party, for neither the entire burden nor the entire benefit passes between them. Circumstances alter cases. Division of the burden calls for an apportionment, division, of the benefits. As equitable considerations, not an inflexible rule of law, govern in the other case, they must do so here.

As to what is an equitable, just and fair apportionment, there is not the slightest doubt. To permit the lessee and the owner of one parcel of the divided land to irrevocably tie up all the other parcels and drain the oil and gas out of them is flagrantly inequitable. The sub-divisions may be small and often are, so one or two wells on one part will completely drain all of the others, and yet their owners, admittedly powerless to prevent it by drilling themselves or in any other way, are precluded from any share in the royalties. Though their lands are burdened with the lease under and by virtue of which their minerals are taken away, they are denied all benefit. The false premise adopted in the argument for the appellees, gives the owner of a sub-division of the entire tract

all of the part of the royalty that comes from his part of the tract, because he is sole owner of that land, instead of part of the royalty arising from the entire leased premises. This makes the lease a burden upon all the sub-divisions for his benefit. Operation of the well on his part, satisfies the vital and controlling condition of the lease and makes it bind the other sub-divisions, without the drilling of any wells thereon or payment of either rent or royalty to the owners thereof. They can neither drill their land, force the lessee to do so nor cause it to be done by anybody else. They are bound hand and foot for the benefit of the lessee and the owner of the sub-division on which he sees fit to put his well. It is not intimated nor suggested that they can enforce drilling on their parts or drill or compel the drilling of off-set wells thereon, to prevent the lessee and the fortunate owner of the part on which he operates, from draining their oil and gas. That the tract of land involved here is a large one, argues nothing in support of the construction. The same rule must apply to both large and small tracts. The injustice of the rule in its application to small ones condemns it as to all. Why this unjust rule should be adopted instead of one that will admit all parties to the benefit of the lease which none of them can destroy or escape I am unable to perceive.

Royalty is analogous to rent. The lessor and lessee in an oil and gas lease are landlord and tenant, after the wells are in operation, and the royalties begin then. In substance and effect, the royalty, is rent for the mines, payable in kind. If a lessor sells and conveys the whole of the leased premises, his grantee takes the whole of the rent. McAdam, Land. & Ten. p. 1026. But, if he conveys only a part of it, or conveys all of it, in parcels to others, the rent must be apportioned, between him and his grantee of a portion of the land, or between the grantees of the several parcels conveyed, comprising the whole, as the case may be; and the apportionment is made in the proportion of the relative values of the parcels, if that is practicable. McAdam, Land. & Ten., pp. 1026-27; Taylor, Land. & Ten., sec. 443. This right of apportionment exists, of course, only in the absence of an agreement excluding it. On a sale of the entire premises, the rent

may be reserved., *Taylor* v. *Cooper*, 10 Leigh 317. The rule of apportionment of rent treats it as an entire thing and divides it among the assignees of the reversion, as the land is divided, and according to the relative values of the parts, not with reference to what each part produces. *Biddle* v. *Hussman*, 23 Mo. 597; *Van Rensselaer* v. *Gallup*, 5 Denio. (N. Y.) 454; *Van Renssellaer* v. *Bradley*, 3 Denio. (N. Y.) 135; *Reed* v. *Ward*, 22 Pa. St. 144; 18 Am. & Eng. Ency. L. 289; 24 Cyc. 1185, citing numerous authorities. That the rent is payable in kind, instead of money, cannot logically or legally vary the rule. The lease binds all the land. If it did not and the drilling on one tract released the balance, there would be no occasion for an apportionment. Since it does, there must be an apportionment of the benefits, to prevent the existence of a grievous burden without any reciprocal benefit. If the right conferred by the lease is analogous to a hunting, trapping or fishing right, as the courts of Ohio, Indiana and Arkansas intimate, the consideration of that right may be a rental payable in kind. If the subject matter of a single and entire contract of that kind is a right covering a certain tract of land which is subsequently divided as to ownership, we are not told why the trapper, confining his traps to one piece of the land and there catching the game from all, is justified in paying all the rent to the owner of that piece. The owner of that piece is not the trapper, and the game caught is not his. It belongs to the lessee whose contract binds him to deliver up a part of it as rent. The law itself is just and fair and parties are not presumed to have intended to make one-sided and unjust contracts. The rule here contended for by the appellees, ought not to be attributed to the law, because it works injustice. For the same reason, it should not be imputed to the parties to a contract, when the division has been made by deed, in the absence of express terms adopting it, for they are presumed to have made a fair and reasonable contract. As the law is just and fair, its interpretation of a decree must be characterized by justice and fairness.

No court has ever been able to lay its finger on any flaw in the reasoning of the opinion in *Wettengel* v. *Gormley,* 160

Pa. St. 559, nor to demonstrate inapplicability of the legal principles under which the court disposed of it. The only objection urged against it, namely, that the oil and gas are legally parts of the land, wherefore assignment thereof otherwise than by deed is either legally impossible, or cannot be deemed to have been within the intention of the parties, or that the lease is not operative until oil is produced, just which is not exactly stated, has been overruled or rejected by this court, in *Lynch* v.*Davis,* 79 W. Va. 437. Of course, the oil and gas adhere to the land and are parts of it, until severed. Until severance takes place, the lessee has no title. On severance and not earlier, the royalty is payable. Then the oil or gas, as the case may be, is personal property for alienation or disposition of which no deed or other solemn instrument of conveyance is necessary. It is personal property in the hands of the lessee and he has bound himself to deliver a portion of it, called royalty, to the lessor as rent in kind, for occupation, use and operation of the lessor's mines. The royalty is a rent susceptible of division and disposition, as if it were a rent payable in money. That is the holding in *Wettengel* v. *Gormley* and *Lynch* v. *Davis.* Existence of the relation of landlord and tenant between the lessor and lessee in a lease of this character, is the uniform holding of this court. Likewise, the royalty has been declared to be not the land nor the oil in place, but the usufruct, the rent return from the oil mine in the land. Though the lease does not actually pass title to the oil or gas, it confers right to take it, and the parts of the divided tract go into the hands of their owners subject to that right, whether they are acquired by deed, will or a decree of partition. The Ohio, Indiana and Arkansas cases relied upon seem to treat the royalty as oil in place. One unsatisfactory feature of the opinions in those cases is the lack of a definition of the royalty. In all of them, it is completely ignored.

The conclusion stated, respecting the rights of the heirs, rests upon a principle which determines the right of the widow. She had no right of dower in possession, in the oil and gas, the lease being alive at the date of the decree, whether the mines be deemed to have been opened in the life-

time of the husband, as held in *Koen* v. *Bartlett,* 41 W. Va. 559, *Williamson* v. *Jones,* 43 W. Va. 566, and *Alderson* v. *Alderson,* 46 W. Va. 242, or not. She had no right to work them. That right was held by the lessee. She had right of dower only in the reversion and in the rental until oil or gas was produced, and in the royalties afterward. The lease had imparted to the minerals a status different from that of the land. They were subject, in the hands of the widow as well as the heirs, to an irrevocable license, if nothing more, to extract and carry them away. For this right, the equivalent of a rent had been reserved by the deceased husband and father, in his lifetime. If this lease had wholly excluded the right of possession in the widow and heirs, dower could have been claimed only in the reversion and in the rent. What is true of the entire right of possession must be true of a part of it. The lease gave the lessee exclusive right of possession of the oil and gas and, therefore, necessarily precluded assignment of possession thereof as dower. Dower could be had, for the time being, only in what was substituted for them, the rents and royalties. The common law allowed dower in rents. Scribner, Dower, Vol. I, pp. 373 to 378. "An estate for years, whether created before or after marriage; and if after marriage whether the wife join therein or not, interposes no obstacle to a claim of dower. In every such case the wife is entitled to be endowed of the reversion in fee, and also of a proportionate part of the rent as incident to the reversion." Scribner, Dower, Vol. I, p. 377.

Neither the decree nor the pleadings in the cause in which the dower was assigned took any notice of the lease, the burden and restriction it placed upon the minerals, nor the rents and royalties, wherefore the partition cannot be deemed to have extended to anything respecting the oil and gas, except the reversion therein. Of course, it gave dower in the land, subject to the burdens created by the lease, but it does not touch the rents and royalties. As to them, the decree must be construed as it is between the heirs. She is entitled to dower in royalties and rents accruing from all the wells on the entire tracts. The leases, the lessee's right under them and the rents are entireties. To permit her to take the whole

of a part of the royalties, instead of her share of all of them, would produce the unjust and absurd results, that would flow from the application of that rule, if applied between the heirs. Through wells on her dower, oil and gas could be drained from some or all of the parts assigned to the heirs, or wells on such parts could drain the dower tract. In either case, the injured party would be helpless, because bound by the lease.

The extent of the widow's right in the royalties, under the circumstances of this case, need not now be determined. Whether she is entitled to one-third of them absolutely, or only to the interest on one-third of them for her life, the plaintiffs or some of them, have right of participation in the royalties accruing from the wells on the dower tract.

From these conclusions, it necessarily follows that, in so far as the demurrers were based upon rights claimed by the defendants, they were not well founded. It is insisted, however, that the husband of Prudentia Campbell, the deceased daughter, and life tenant by the curtesy of the land assigned to him and their children, is entitled to the corpus of the royalties that would go to her, if living, and that her heirs are, for that reason, improperly joined as co-plaintiffs. As reversioners, the heirs may well have their interests defined in this suit. They are interested parties. Even though a court might not be bound to entertain a bill filed by them for that purpose only, no reason is perceived why they may not be entertained therefor, in a suit well founded and well brought, in which the estate in which they have the reversion, at least, is involved. Whether they have any present interest in the royalties and rents, it is unnecessary to inquire. As to that, there may be no dispute between them and their father.

The decree complained of will be reversed, the demurrers overruled and the cause remanded.

*Reversed, demurrer overruled, cause remanded.*

RITZ, JUDGE, (dissenting):

With the conclusion that the royalties derived from the oil produced from the Lewis land must be divided ratably among his heirs, notwithstanding the land has been partitioned

among them, no matter whether such oil comes from the part assigned to only one of them, or all of them, I cannot agree. Lewis executed the oil leases covering the land prior to his death. After his death, but before development for oil, his lands were partitioned among his heirs, no reference being made to the oil and gas lease in the partition proceeding. When the respective tracts were thus assigned it must be conceded that the party to whom each tract was so assigned, acquired every interest that Lewis had therein at the time of his death. What was this interest? The oil and gas leases, it must be borne in mind, did not pass title to anything to the lessee. They simply conferred the privilege of going upon the land and exploring for oil and gas, and removing the same if discovered. Then, at the time the land was partitioned, each of the heirs to whom a parcel was assigned acquired everything that Lewis owned in such parcel at the time of his death, including all oil and gas. Oil and gas are minerals, and so long as they are in place they belong to the owner of the land under which they lie, and the right also belongs to that owner of the land to explore for them and extract them therefrom. If they escape from his premises to the premises of another before he has captured them, they no longer are his property; and vice-versa, if by exploration upon his premises oil escapes thereto from the premises of an adjoining owner it thereby becomes his property. From this it necessarily follows that when the respective parcels were laid off to Lewis's heirs, each acquired all of the estate in the tract assigned to him, subject only to the rights of the lessee to explore for and produce the oil and gas. This right is exactly the same that would have existed in the heirs of Lewis holding the several tracts assigned to them had there been no lease, from which it necessarily follows that the owner of each sub-division is entitled to the royalties on all of the oil produced from wells drilled on his sub-division. Suppose the mineral affected by the lease was coal, can it be doubted that each of the parceners would take the coal under the tract assigned to him, and upon its production would be entitled to the payment therefor? I perceive no reason for invoking a different rule in the case of

oil or gas. They are as much a part of the realty as any other mineral and belong to the owner of the land under which they are captured as fully as coal belongs to the owner of the land from which it is taken. This view is supported by the case of the *Northwestern Ohio Natural Gas Co.* v. *Ullery,* 68 O. St. 259. In that case the owner of two adjoining tracts of land containing respectively forty and sixty acres leased them for oil and gas purposes. He subsequently conveyed the forty-acre tract to the defendant Ullery, and the sixty-acre tract to a man by the name of Shoop. A well was drilled upon the forty-acre tract which produced gas. Ullery, the owner of this forty-acre tract, claimed the compensation provided to be paid for a gas well, and Shoop, the owner of the sixty-acre tract, also claimed an interest in this royalty. An action was brought by Ullery to recover from the 'gas company the rentals provided to be paid. It will be seen from this statement that that case was exactly in point with the case we have here. The very learned and philosophical Chief Justice Burket delivered the opinion of the court in that case, which fully supports the views above expressed. In the case of *Osborn* v. *Arkansas Territorial Oil & Gas Co.,* (Ark.) 146 S. W. 122, an exactly analogous case was presented to the Supreme Court of Arkansas for decision. T. N. Sloat, being the owner of a tract of eighty acres of land, executed an oil and gas lease thereon. After the execution of said lease and before the production of oil and gas he conveyed forty acres off said tract to another, and subsequently conveyed to the trustees of a church a tract of one-half acre from the remaining forty acres. The lessee, acting under the original lease executed by Sloat, drilled a well upon the half-acre tract conveyed to the church trustees, and upon the question being submitted to the Arkansas Supreme Court as to whether all of these royalties should be paid to the church trustees, or whether they should be divided between the owners of the eighty acres of land in the proportion in which they were interested therein, it was held that the church trustees were entitled to the whole thereof. In this connection, the following quotation from the opinion of the court in that case is instructive: "We are of the opinion

that the fact that the lease was executed before the convey-
ance to the trustees of the church did not alter or lessen their
right of ownership of the gas, which was a part of the realty
granted to them. As was said in the case of *Natural Gas Co.
v. Ullery, supra*: 'The fact that oil and gas are vagrant and
transitory in their nature does not prevent their adhering
to and becoming a part of the land while passing from one
tract to another, and while so in one tract they are a part
of that tract and belong to the owner thereof until they
escape from such tract, and, if brought to the surface be-
fore such escape they become personal property belonging to
the owner of the land. It therefore irresistibly follows that
the oil or gas taken from the well on a particular tract of
land belongs to the owner of that tract, even though the
contract under which the well was drilled included other
tracts of land. Because the contract of production may have
included two or more tracts of land, such contract cannot have
the force of taking from the owner of one tract the oil or gas
adhering to such tract for the time being and bestowing it
upon the owner of another tract, where it may never have
been.' " In the case of *Fairbanks v. Warrum*, 56 Ind. App.
337, 104 N. E. 583, an exactly similar question was before that
court. Noble Warrum was the owner of two tracts of land con-
taining fifteen acres and three hundred and fifty-three acres
respectively, and he executed an oil and gas lease covering
both of them. Subsequently he sold and conveyed the fifteen-
acre tract and fifty-eight acres off the other tract. A well was
drilled under the lease upon the 353-acre tract, but not upon
that part thereof included in the 58 acres conveyed away.
The grantees in the deed from Noble Warrum conveying the
15 acres and the 58 acres above referred to, contended that
they were entitled to receive part of the royalties from this
well. This contention was not sustained by the court, but
on the contrary it was held that the royalties belonged to
the party upon whose land the well was drilled. The reason-
ing of the courts in these cases commends itself to my judg-
ment, and I believe condemns the conclusion reached by the
majority in this case. I am satisfied that each of the heirs
of Lewis took every estate there was in the parcel of land

assigned to him, including the oil and gas underlying the same, or which might be captured by development thereon, whether such development was made under the lease executed by the former owner Lewis or otherwise.

I am not unmindful of the fact that the above views are inconsistent with some expressions contained in the opinion in the case of *Lynch* v. *Davis*, 79 W. Va. 437, 92 S. E. 427. Upon a consideration of that opinion I find that there are expressions contained in it which were not at all necessary for the decision of that case. The controlling fact there was that the separate owners of the several adjoining tracts of land combined them themselves for the purpose of oil and gas production. The tracts of land were small; they lay contiguous to each other; and it may be well assumed that the oil and gas could be produced therefrom more economically if the whole acreage was treated as one tract than if each tract was leased separately. In fact, it could not well be held otherwise than that the purpose of those parties was to treat their oil and gas as held by them in common. They combined their holdings under a single description, and so far as the lease goes there is but one tract of land to be dealt with. The case of *Higgins* v. *California Petroleum and Asphalt Company*, 109 Cal. 304, is very similar in its facts to the case of *Lynch* v. *Davis*. In that case the owners of two adjoining tracts of land, for the purpose of having the mineral asphalt mined therefrom, combined them and leased them as a single tract, and the court held that by thus doing they in effect made themselves tenants in common in such mineral. That is the effect of the holding in *Lynch* v. *Davis*, and the only effect which should be given to the opinion in that case. Confining the language used in the opinion in that case within these limitations, it is not inconsistent with the opinion I now entertain, and correctly solves the questions there involved.

Judge POFFENBARGER in his opinion proceeds upon the theory that by the execution of the oil and gas lease there was created or brought into being an estate in the land which had not theretofore existed. to-wit, the royalty in the oil and gas. He says: "The royalty is a separate and distinct en-

tity. It is not the land, nor the land title. It is a wholly
different thing from either, and is complete in itself, not-
withstanding it comes from the land.'' I cannot agree that
the royalty in the oil and gas is a separate and distinct
entity from the land. It is well established that a grant of
the rents and profits, or the income of land, passes the land
itself, both in law and in equity. Judge POFFENBARGER de-
clared in *Toothman* v. *Courtney,* 62 W. Va. 175, that the
reservation of the rental or royalty arising from the oil and
gas was a reservation of the oil and gas in place, so that this
estate or entity which Judge POFFENBARGER calls royalty is
nothing more than the oil and gas in place, and it could not
be separate from the principal estate, inasmuch as both of
these estates were vested in Lewis. He had never parted
with the oil and gas, or with the royalty to anyone. It is
fundamental that a party cannot have two estates in the same
piece of land. There may be, it is true, several estates or
interests carved out of it held by separate parties, but when
one party acquires them all the lesser estates are immediately
merged into the greater, and he becomes the owner of a single
estate therein, the fee simple absolute. So I say when Lewis
died he was the owner of but a single estate in the land of
which he died seized, to-wit, a fee simple absolute, and this
passed to and vested in his heirs at law. They did not in-
herit from him the land, and then another estate called the
royalty in the land, but they inherited simply the land.
Judge POFFENBARGER holds that when this land was partitioned
the division of the land did not divide the royalty among the
heirs, because of the fact that it is a separate entity and had
an existence separate and apart from the land itself. This
position is untenable if there was no other estate vested in
Lewis's heirs than the fee simple absolute. It must be con-
ceded that prior to the partition of the estate there was
vested in these heirs of Lewis every interest in this land, in-
cluding the oil and gas, and the right to receive any rentals
or royalties that might be derived therefrom. What was
the effect of partitioning the land? It did not change in any
way the title by which it was held, or the estate which the
parties held in it, but it simply converted their joint holdings

into separate holdings. It conferred upon each of the heirs to whom a part was assigned the title and estate of all the heirs in that part, so that the owner of each of these parcels got everything in them which was theretofore vested in himself and his co-parceners so far as the parcel assigned to him is concerned. There is nothing about oil and gas which distinguishes it from other minerals except its vagrant character, and this does not affect in any way the ownership thereof. It is as much the property of the party upon whose land it is discovered as is coal the property of the party upon whose land it exists, or as timber belongs to the land upon which it grows. Suppose for the sake of the argument in this case that part of Lewis's land had timber growing thereon, and he had executed a paper granting to another the right for ten years to cut the timber off the whole tract of land, and providing that in case the timber was so cut at any time within the ten years one-eighth of the lumber manufactured from such timber should be delivered to Lewis, and before any operations were commenced under such a contract Lewis died and his heirs partitioned his estate, just as was done here, and one of the heirs had assigned to him a tract of land upon which there was no timber, and subsequently the timber was cut under the contract, would it be contended for a moment that the royalties arising from the cutting of the timber did not belong to the party from whose land the timber was cut? A number of cases are cited holding that when leased land is divided among several parties the rents arising therefrom will also be divided. Those cases are without application here for the reason that the leases in those cases were general leases. The whole estate in the land was leased. Here only a particular part of the land is leased. To make a correct application of an agricultural lease, we will say that Lewis owned a large tract of land, as was the case here, and he leased this land for the purpose of raising corn thereon. There is only a very small part of the land upon which corn can be raised. In a division of the land among Lewis's heirs this corn land goes to one of them as his part; to another is assigned a piece upon which corn cannot be grown, but it is valuable fruit land, and because

of that fact it is worth just as much as the corn land; another is valuable mineral land, and because of the minerals under it it is worth just as much as the corn land. Would it be said that the rents arising from the corn raised upon the tract of land which was capable of bearing corn must be divided among all of the heirs just because it had been leased for that purpose before the death of their ancestor? This, it can readily be seen, would impose a manifest hardship upon the one who would happen to receive the assignment of the land which would bear corn. It is argued that no hardship can result from the application of the rule laid down in the opinion by Judge POFFENBARGER. I do not agree with that conclusion. Serious hardship may result. After the exhaustion of the oil on part of this land the lessee may abandon the land as not being profitable under present conditions, and leave the oil in place upon the lands of some of the co-parceners. Subsequent developments, the increased use of these minerals for commercial and scientific purposes, may make very valuable in the near future what is now of no value, so that the party who owns the land which was not developed will have a very valuable estate in the future in the oil and gas therein, while his co-parceners' land has been depleted of its oil and gas for the common benefit. Can it be said that this is an equitable result? It is one that is bound to flow from the application of the rule laid down in this case.

Judge MILLER concurs with me in this dissent.