(No. 30556.—

CENTRAL PIPE LINE COMPANY *vs.* GENEVA HUTSON *et al.,* Appellants.—(ELSIE MAE CORNSTUBBLE *et al.,* Appellees.)

*Opinion filed November 18, 1948.*

HILL & DOLAN, of Mt. Vernon, and CREIGHTON & KERR, of Fairfield, for appellants.

CRAIG & CRAIG, of Mt. Vernon, for appellees.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Wayne County in favor of appellees, in an action of equitable interpleader instituted by the Central Pipe Line Company to determine the ownership of funds in its hands. The funds were derived from the purchase of royalty oil, and a determination was also sought of the ownership of future funds to be derived from the same source.

We ascertain the basic facts to be as follows: In July, 1936, Emma Tyler, a widow, owned 114 acres of land. On July 13 of that year she leased all of the land for oil and gas; 74 acres thereof being in sections 27 and 28, and 40 acres being in section 4. Before any oil or gas wells were ever drilled upon any of the acreage, Emma Tyler in January, 1938, (as an act of voluntary division between her children,) by deeds conveyed all of the land in fee. In each deed she reserved a life estate which she enjoyed until her death intestate in November, 1941. In December, 1945, wells were drilled on the 74-acre tract; no wells were ever drilled on the 40-acre tract. From those wells oil was produced, sold and marketed to an extent whereby the Central company had impounded $4726.95.

By various assignments the oil-and-gas lease as to the 74-acre tract passed to one Mitchell. By mesne conveyances the fee in the 74 acres became vested in Elsie Mae Cornstubble. A one-half of the fee in the 40 acres remained in Geneva Hutson, who is a daughter of Emma Tyler.

The other one-half of that fee belonged to Lucille Coil, another daughter of Emma; this one-half became the property of Cecil Tyler subject to a reservation by Lucille of an undivided one-fourth of the minerals for 20 years or so long as oil or gas is produced. The oil-and-gas lease covering the 40-acre tract was retained by the assignee of the original lessee.

The oil-and-gas lease which Emma Tyler gave did not contain a royalty proration clause providing, in the event the leased 114 acres shall thereafter be owned in severalty or in separate tracts, that the entire 114 acres shall be developed and operated as one lease, and that all royalties accruing thereunder shall be treated as an entirety, to be divided among and paid to the separate owners in the proportion the acreage of each separate owner bears to the entire leased acreage.

Errors relied upon by the appellants, and the counter-propositions advanced by appellees to negative them lead to but one issue. It is—where a lease for oil and gas does not contain a proration clause, and the owner of the fee, subsequent to the execution of the lease, disposes of all by conveying portions thereof to others, and oil or gas is produced from some portion of the leased property after it was fractioned, does the royalty therefrom belong only to the owner of the particular portion upon which the well is located, or does the royalty belong to all the owners of all the portions upon a prorata basis? Courts of last resort of other States have been confronted with this issue, but this is the first time it has been presented to this court.

The appellants advance the point that, as a matter of law, oil-and-gas-lease royalties should be apportioned in the same manner as is the apportionment of rentals payable under surface or business leases. This is predicated upon the fact that apportionment of rentals has long been recognized in Illinois. (*Crosby* v. *Loop*, 13 Ill. 625; *Hill* v. *Reno*, 112 Ill. 154.) Oil before being separated from the

land is a mineral and is a part of the land. (*Jilek* v. *Chicago, Wilmington & Franklin Coal Co.*, 382 Ill. 241.) A mining lease only gives to the lessee the right to find and reduce minerals to possession, the title to the minerals remaining in the lessor just as long as they remain in the land. The lessee pays the rent or royalty only upon what he finds and takes possession of. (*Updike* v. *Smith,* 378 Ill. 600; *Triger* v. *Carter Oil Co.* 372 Ill. 182.) Unaccrued rent is part of the land, being an incorporeal hereditament which follows the land and passes with a devise or sale thereof. *People ex rel. Hargrave* v. *Phillips,* 394 Ill. 119.

Where this issue has been presented to the courts of last resort in other States their decisions have not been universally harmonious. The lack of harmony is due to a fundamental difference of opinion regarding the innate character of potential oil or gas royalties. *Wettengel* v. *Gormley,* 160 Pa. 559, 28 Atl. 934 (1894), is the earliest reported case dealing with this issue. Gormley owned three farms and gave one oil-gas mining lease. After his death each of his three children obtained a farm by devise. Subsequent to Gormley's death the lessee produced oil from one of the farms, but production was not obtained from the other two. The royalty was apportioned among the three devisees on the ground they were entitled to share therein because the oil may have been drawn from the three farms. Besides giving consideration to the fugacious nature of oil and gas, the court reasoned from the character and legal effect of the lease. An oil lease, it held, partakes of the character of a lease for general tillage, *i.e.,* agricultural, rather than of one for the mining or quarrying of solid minerals. The court lacking any precedent to follow applied to the issue the doctrine of the apportionment of surface rents. The court had occasion in *Wettengel* v. *Gormley,* 184 Pa. 354, 39 Atl. 57, to examine its holding in the prior case. It stood by that holding, stating additionally that, inasmuch as the lease covered the three

farms as a single, undivided tract, the rent (royalties) may be said to issue from each and every part. The royalties belonged to all the owners and not to the owner of any part. The court held the royalties to be personal estate which was not disposed of by Gormley in his will, hence were intestate property, to be divided among the three children in the proportion his or her share of the land bears to the whole acreage subject to the lease. The royalties were payable upon the total production from the whole acreage whenever and wherever production took place.

*Lynch* v. *Davis,* 79 W. Va. 437, 92 S.E. 42, presented the question of the division of royalties where the devisees of a tract of land partitioned it and *later* executed their joint oil-and-gas lease covering the whole tract. No provision was contained in the lease for the payment of the royalties separately to the lessors. The court held the terms of the lease made it mandatory to pay the royalties to all, regardless of upon which portion of the whole tract the oil was produced. The rule laid down in *Wettengel* v. *Gormley,* 160 Pa. 559, 28 Atl. 934, was approved and was applied in the succeeding case of *Campbell* v. *Lynch,* 81 W. Va. 374, 94 S.E. 739. In the latter case the owner of two tracts leased them by separate leases. The owner died, and the two tracts were partitioned by court order and various parts given to respective heirs. Subsequent to the partition producing wells were drilled on several tracts, except lot No. 6 of the partition. The owners of that lot sued to obtain a share of the oil royalties and gas rentals coming from the other lots. The court declared the oil royalty constituted rental of all of the two tracts. It is not the land or the land title, being something complete in itself although analagous to rent, for it comes from the land. The case of *Pittsburgh and West Virginia Gas Co.* v. *Ankrom,* 83 W. Va. 81, 97 S.E. 593, distinguished *Lynch* v. *Davis* from *Campbell* v. *Lynch,* and repudiated the rule in *Wettengel* v. *Gormley* which had been applied in *Campbell*

v. *Lynch*. The court adhered to the contrary doctrine of treating unaccrued royalty as real property and not as personal property. In *Musgrave* v. *Musgrave*, 86 W. Va. 119, 103 S.E. 302; *Fisher* v. *Teter*, 89 W. Va. 693, 109 S.E. 896; *Walker* v. *West Virginia Gas Corp*. 121 W. Va. 251, 3 S.E. 2d 55, and *Robinson* v. *Milam*, 24 S.E. 2d 236, the doctrine adopted in the *Ankrom case* was consistently adhered to.

In 1919 the Supreme Court of Oklahoma decided *Kimbley* v. *Luckey*, 72 Okla. 217, 179 Pac: 928, involving the following facts. Floyd Luckey, the owner of 160 acres, conveyed his title to all the land to Louis Luckey by warranty deed. Both Luckeys joined in an oil-and-gas lease to Lambert covering the whole acreage; thereafter, but before the development of the property for oil and gas, the Luckeys conveyed 40 acres *via* intermediary parties to Kimbley and another. Lambert produced oil on the 120 acres remaining with the Luckeys but never produced any on the 40 acres. Kimbley and the other sued to recover a portion of the royalties paid the Luckeys, basing their action upon the proposition the royalties were personal property in the guise of rent, therefore such should be apportioned as coming from the whole 160 acres. They relied upon the holdings in *Wettengel* v. *Gormley, Lynch* v. *Davis, Campbell* v. *Lynch,* and *Higgins* v. *California Petroleum & Asphalt Co.*, all of which are cited and discussed herein. The Oklahoma court carefully examined those cases and refused to follow them. It said the warranty deed conveying the 40 acres was made in substantial conformity with Oklahoma law and therefore conveyed to the grantee, his heirs or assigns, the whole interest of the grantor in the premises, including whatever was underneath the surface of the earth, be it oil, gas, or other valuable minerals. The common-law rule of apportionment of rents in agricultural leases, where the lessor sells a portion of the leased premises to a stranger and apportion-

ment is not covered by contract, has no place in jurisprudence in respect to oil-and-gas leases. To apply that rule of apportionment to such cases, the court held, would be destructive, at the least, of titles acquired by purchase and destroy the prevailing belief of the business world that land ownership constitutes the basis of title to production. The doctrine of *Kimbley* v. *Luckey* has been consistently approved in Oklahoma. *Pierce Oil Corp.* v. *Schacht,* 74 Okla. 101, 181 Pac. 731; *Galt* v. *Metscher,* 103 Okla. 271, 229 Pac. 522; *Gypsy Oil Co.* v. *Schonwald,* 107 Okla. 253, 231 Pac. 864.

The Court of Appeals of Kentucky in. *McIntire's Admr.* v. *Bond,* 227 Ky. 607, 13 S.W. 2d 772, was faced with these facts: The owner of a farm, after giving an oil-and-gas lease thereon, died before there was exploration and production under the lease. The farm was divided among his children by a partition proceeding, no mention being made therein of the lease and the royalties to accrue thereunder. After partition oil was produced on a tract belonging to one of the children, and the question arose over who were entitled to the royalty oil, all of the heirs, or just the one from whose tract the oil was obtained. The court ordered a judgment entered apportioning the royalties in accordance with the doctrine of apportionment of surface rents. The result of this decision was to place Kentucky in the same column with Pennsylvania. In *Hurst* v. *Pakin,* 287 Ky. 257, 152 S.W. 2d 981, and *Hammond* v. *Hammond,* 292 Ky. 659, 167 S.W. 2d 865, the Court of Appeals by a reverse play abandoned the doctrine that accrued royalties should go to all the owners of tracts the sum of which constituted the whole leasehold estate, and not solely to the owner of the particular tract from which the oil is being obtained. Conversely, the owner of the individual tract has no right to any royalties or rents accruing under the lease from the production of wells not situated on his property. The case of *Stratton* v. *Kentucky & West Vir-*

*ginia Gas Co.* 298 Ky. 651, 183 S.W. 2d 817, decided by that court subsequent to the two last cited cases, in nowise contradicts the holdings therein. It simply affirmed a judgment of the lower court because of a failure to bring up a record from which the court could have decided the case upon the merits.

Where the State of Kansas stands on this matter is clearly disclosed in *Carlock* v. *Krug,* 151 Kan. 407, 99 Pac. 2d 858. It held that where land on which an oil-and-gas lease has been given is subsequently divided in ownership, —either surface or mineral rights,—the owners of the separate parcels have a right to share in any production later had if the production comes from their own land, but do not share in what comes from the lands of the others under the common lease. The above is applicable only in the absence of express grant, reservation or devise. The court conceded a conflict of authority on the matter, and after a survey of the prior cases in other jurisdictions, refused to follow Pennsylvania in applying the doctrine of apportionment. In Kansas the word "royalty" does not refer to oil in place, but does refer to the share paid from production as compensation for the right to drill and produce, the production belonging solely to the owners of the well and of the land upon which the well is located.

The question before this court was presented to the Supreme Court of Arkansas in *Osborn* v. *Arkansas Territorial Oil & Gas. Co.* 103 Ark. 175, 146 S.W. 122, wherein the owner of 80 acres gave a gas lease thereon, and subsequently conveyed the fee to forty acres to another, who in turn conveyed one-half acre to a third person. It was held this third person thereby acquired a right to the rentals for gas discovered and produced on the one-half acre. The court specifically refused to follow the doctrine laid down in the Pennsylvania case of *Wettengel* v. *Gormley,* 160 Pa. 559, 28 Atl. 934. It did follow the opposite course because a conveyance of gas in its natural state in the land

required all those conveyancing formalities which any other interest in the same real estate would demand. The ownership of the gas passes to the grantee of the land in the absence of express reservation in the conveyance.

In Indiana the issue was presented in *Fairbanks* v. *Warrum*, 56 Ind. App. 337, 104 N.E. 983, by these facts: Warrum, after executing a gas lease on his land, later conveyed 58 acres thereof. Subsequently, gas was produced on the land he retained, and the grantees of the 58 acres believed they were entitled to a portion of the proceeds from the gas production. The court held the grantees were not so entitled. *Wettengel* v. *Gormley* was examined by the court and not followed. In the Ohio case of *Northwestern Ohio Natural Gas Co.* v. *Ullery,* 68 Ohio St. 259, 67 N.E. 949, two separate tracts were covered by one oil-and-gas lease. Thereafter both tracts were conveyed, but at different times. The issue arose over whether the gas rental should be apportioned when there was a well on one tract only. The decision was that it should not be, the rental belonging exclusively to the owner of the tract on which the well was situated. The court carefully considered the Pennsylvania doctrine in *Wettengel* v. *Gormley,* 160 Pa. 559, 28 Atl. 934, and refused to apply it to the facts, saying, "The fact that oil and gas are vagrant and transitory in their nature does not prevent their adhering to and becoming a part of the land while passing from one tract to another, and while so in one tract they are a part of that tract and belong to the owner thereof until they escape from such tract, and, if brought to the surface before such escape, they become personal property belonging to the owner of the land. It therefore irresistibly follows that the oil or gas taken from the well on a particular tract of land belongs to the owner of that tract, even though the contract under which the well was drilled included other tracts of land. Because the contract of production may have included two or more tracts of land, such

contract cannot have the force of taking from the owner of one tract the oil or gas adhering to such tract for the time being and bestowing it upon the owner of another tract, where it may never have been."

In *Gillette* v. *Mitchell*, — Texas, —, 214 S.W. 619, Minnie Gaillard owned 42 acres and leased the acreage to Hindman for the production of oil and other minerals. He developed a producing well prior to the death of Mrs. Gaillard. The lease provided for its forfeiture if the lessee failed to diligently prosecute the development for oil; it also provided Hindman should be entitled to retain the lease so far as it may relate to any well already drilled and to 7 acres around it, there to be no forfeit insofar as the 7 acres is concerned, as long as it shall produce oil and the lessee shall operate thereon. When Mrs. Gaillard died, there were three producing wells on the 42 acres under the lease. She devised separate small tracts out of the 42 acres to different members of her family. Two acres went to Allan and Sidney Mitchell, and a life estate in another tract of 2 acres to Mrs. Gillette. The two tracts adjoined. The first producing oil well was located on the Mitchell 2-acre tract. The will made no mention of the royalties from the oil well. The lease became forfeited shortly after the death of Mrs. Gaillard, and Hindman retained and operated the producing well on the Mitchell 2-acre tract and the 7 acres around the well. This 7-acre tract included 4 acres out of the 42 acres, 1 acre of which was a part of the 2-acre tract devised to Mrs. Gillette. She claimed a one-fourth interest in the royalties received from the well by the Mitchells since the death of Mrs. Gaillard. The court believed the doctrine announced in *Wettengel* v. *Gormley*, 160 Pa. 559, 28 Atl. 934, sound and applied it to the facts of the case; even though it said that it is settled by the decision of the Supreme Court of Texas that, notwithstanding its fugitive nature, oil belongs to the owner of the land under which it is found, and the landowner

may, by sinking a well on his land, acquire title to all of the oil produced therefrom regardless of the fact that it may be drawn from under the lands of adjoining landowners.

*Hoffman* v. *Magnolia Petroleum Co.* 260 S.W. 950, (Court of Civil Appeals, San Antonio,) contained these facts: Duke and wife executed an oil-and-gas lease on 320 acres to Harvey for one-eighth royalty. Afterwards Duke and wife conveyed to Hoffman an undivided one-half interest in all minerals, oil, and gas in and under 90 acres out of the leased 320 acres. This deed recited the sale was subject to the oil lease and covered and included one-half of all oil royalty, and gas rental or royalty due to be paid under the lease. On that clause was based the claim for one half of all the oil-and-gas royalties payable under the lease, *i.e.*, including not only the 90 acres, the mineral rights of which were conveyed to him by Duke and wife, but also one half of all the royalties payable under the lease, or at least that the claimant is entitled to a fractional interest in all the oil-and-gas royalty accruing under the lease. No oil or gas was found or taken from the 90 acres, for no well had been drilled thereon. It was held that all Hoffman got by his mineral deed was a one-half interest in and to all of the oil, gas, and other minerals in and under the 90 acres of the leased land and he was not entitled to such on the 320 acres. The court cited *Kimbley* v. *Luckey*, 72 Okla. 217, 179 Pac. 928. *Hoffman* v. *Magnolia Petroleum Co.* 273 S.W. 828, (Commission of Appeal in Texas, Section B,) was the prior case on appeal. The decision of the Court of Civil Appeals was reversed. Inasmuch as the oil-and-gas lease covered the entire 320 acres, when the mineral deed referred to the "lease" it could only refer to the lease on the whole 320 acres. The court determined that the solution of the issue turned upon construction of the language of the mineral deed, and it construed the language of the deed to show the parties

thereto intended it should convey a one-half interest in the royalty to accrue under the terms of the oil-and-gas lease as an entirety, *i.e.*, the 320 acres. The court said the view it took rendered unnecessary a consideration of the question upon which the opinion of the Court of Civil Appeals based its decision, alleged to be in conflict with the opinion expressed by the Court of Civil Appeals in *Gillette* v. *Mitchell*, 214 S.W. 619.

In *Japhet* v. *McRae*, 276 S.W. 669, (Commission of Appeals of Texas, Section B,) are found these facts: Fisher, owner of 15 acres, gave an oil-and-gas lease thereon to the Producers' Oil Company. Thereafter Fisher conveyed to Keeble the north 5 acres thereof, and Keeble then conveyed to McRae an undivided 3 acres out of his north 5 acres. Eighteen months after Fisher sold the 5 acres to Keeble, Fisher sold to the same Keeble the remaining south 10 acres of the 15-acre tract, and he conveyed this 10 acres to Japhet. All the deeds were of the usual form of warranty deed, and all referred to the lease to the Producers' Oil Company, which lease was in the usual or commercial form of all leases. None of the deeds provided for an apportionment of the one-eight royalty retained by Fisher among the various divisions of the 15-acre tract. After Japhet secured the 10 acres, the oil company, as lessee, drilled and found much oil thereon, but did not drill on the north 5 acres. McRae and Keeble sued for 5/15ths of the one-eighth royalty from this oil. The lower court found for the defendant Japhet, and on appeal the Court of Civil Appeals at Galveston rendered judgment in favor of McRae and Keeble for one-third of the royalty. This particular appellate court, Commission of Appeals, said that because of the importance of the question it had consulted with the Supreme Court of Texas before arriving at a conclusion, and that was the first time the Supreme Court ever had an opportunity to pass upon the particular question.

This appellate court said it followed the great weight of authority and could not follow the holding in the case of *Gillette* v. *Mitchell,* 214 S.W. 619. Further, no other Texas court ever passed upon this question except the Court of Civil Appeals at San Antonio in the case of *Hoffman* v. *Magnolia Petroleum Co.* 260 S.W. 950. It said the decision in that case was based on the language in the instruments involved and it was not necessary for that court to pass upon the question of the applicability of the apportionment-of-royalty doctrine, although that court clearly expressed its approval of the doctrine represented by the greater weight of authority. Specifically the court reversed the Court of Civil Appeals at Galveston and affirmed the judgment of the district court wherein the action originated, and said, "Where the lessor of land for oil and gas, subsequently to the execution of the lease, but prior to the development of the land and the production of oil and gas under the lease, sells a portion or portions of the land to others, and oil and gas are thereafter produced under the lease from some portion of the leased premises, the royalties therefrom belong to the owner of the particular tract upon which the well is located, and the owner or owners of other portions of the leased premises have no interest therein."

The decision in *Higgins* v. *California Petroleum & Asphalt Co.* 109 Cal. 304, 41 Pac. 1087, does not assist the appellants. Higgins and Ashley each owned in severalty adjoining tracts. They united in giving one lease for the mining of asphaltum from any part of the two tracts. The share of Ashley was subsequently conveyed to the lessee. No asphaltum was ever mined from the Higgins tract and he sued for the royalty claimed due him, *i.e.,* one half of the 50 cents per ton. The court, relying partly on *Hill* v. *Reno,* 112 Ill. 154, said that had Ashley and Higgins been tenants in common the latter would be entitled to his pro-

portionate share of the royalty. Even though they were not such tenants Higgins would be entitled, in the absence of an agreement to the contrary, to a portion of the royalty proportionate to the comparative value of his part of the leased premises. It is clear the court looked upon royalty as personalty, *i.e.*, rent. This result was derived from the court's construction of the lease made in the light of the parties' practical construction thereof; the royalty going to the lessors, not to the individual from whose land the asphaltum may be mined. The existence of a specific agreement about payment of royalties renders the case inapplicable to the issue before this court.

The appellants believe the Supreme Court of California was confronted with the question in *Standard Oil Co.* v. *John P. Mills Organization,* 3 Cal. 2d 128, 43 Pac. 2d 797. The company instituted an interpleader action to settle claims to royalty oil proceeds in its hands. It had purchased the oil from an operator who held the lease on block V, Signal Hill, Los Angeles County, in return for a 1/6th landowner's royalty. In 1923 the Mills Organization owned the block subject to the lease when it subdivided the block into 83 lots. All were sold under a plan whereby there was to be conveyed to each lot purchaser 1/83d of the 1/6th royalty, this being 1/498th part of all oil and gas production from the block. Through an inadvertence six of the lots were conveyed without the conveyances including the transfer to each purchaser of "1/498th part of all oil and gas produced * * * on said block V." Smith and wife, through mesne conveyances, became the owners of three of those six lots, all of the wells being on those three lots with the exception of one lot, and it was not involved. The Smiths contended they were entitled to all the royalty money to the exclusion of all owners of the other lots. The trial court found the Smiths had purchased their lots with full knowledge of the scheme of subdivision and of the plan to give each lot owner a share in oil pro-

duced anywhere on block V. The Smiths did not become owners of their lots until after all 83 lots had been sold by the Mills Organization. It was held, first, assignments by a landowner of his royalty interests create rights which are enforcible against a subsequent grantee of a general estate in the land; second, when land subject to a single oil-and-gas lease is subdivided by deeds or by partition among heirs on the death of the landowner lessor, and there is no reference in the deeds or partition proceedings to any oil rights, then the landowner's royalty on oil thereafter produced does not go to the section upon which oil has been produced, but is to be apportioned among the several owners. The court in arriving at this second holding paid particular attention to and agreed with *McIntire's Admr.* v. *Bond,* 227 Ky. 607, 13 S.W. 2d 772; *Campbell* v. *Lynch,* 81 W. Va. 374, 94 S.E. 739, the dissenting opinion of Poffenbarger, J., in *Musgrave* v. *Musgrave,* 86 W. Va. 119, 103 S.E. 302, and *Wettengel* v. *Gormley,* 160 Pa. 559, 28 Atl. 934. The court held the failure to incorporate in the deeds to the six lots language whereby the 1/498th part of the royalty would have been transferred, as it was in the deeds to the other lots of block V, was rectified by prior litigation in effect operating to reform those deeds so they conformed with the others. The court also approved the finding of the trial court that the Smiths purchased their lots with full knowledge of the subdivision and of the plan to give each lot owner a share in the oil produced anywhere on block V. By so doing the court set up a state of facts wherein each deed to the 83 lots,—less one not involved,—conveyed specifically a 1/498th part of the landowner's royalty under the lease. Those facts are quite different from the propositional facts stated by the court, and on which it depended in approving the doctrine of apportionment. In other words, the holding of the court in favor of that doctrine was not remotely connected with the issue of the case before it, and clearly was not necessary

in reaching a decision thereon. The case is not persuasive on the point that the court adopted the doctrine requiring royalty oil proceeds of the landowner to be apportioned among the several subsequent owners of the land in the absence of specific reservation to the contrary.

The appellants concede no issue like the one presented here has arisen in the State of Louisiana, but cite decisions from that State which, they allege, bear upon it. We have examined those cases and do not believe them to be pertinent. Thompson On Real Property, Perm. Ed., vol. 10, sec. 5592, is also cited and quoted from. The quoted portion of the cited section pertains only to the situation "where several owners of adjoining tracts of land join in a single lease thereof, * * *." What we have said concerning the inapplicability of the holding in *Higgins* v. *California Petroleum & Asphalt Co.* 109 Cal. 304, 41 Pac. 1087, to the issue here, also covers said section. Appellants cite and also quote from Summers Oil and Gas (Perm. Ed.), vol. 3, secs. 608 and 609, and the cumulative 1947 part thereto, as being an interesting discussion of the various authorities, *i.e.*, just *Wettengel* v. *Gormley*, 160 Pa. 559, 28 Atl. 934. The appellees quote from note 5 of section 608 wherein Professor Summers states, "The theory presented in this appeal of *Wettengel* v. *Gormley* to support apportionment of royalties between the devisees of distinct parcels of the land seems wrong for several reasons. In the first place unaccrued oil-and-gas royalties are practically everywhere else held to be real and not personal property. Of course the Court had to say that this interest was personal property, for if held to be real property it would have merged in his estate in the land and have passed to the devisees. If a lessor sells land subject to an oil-and-gas lease the purchaser is entitled to receive such royalties as may be payable after he acquires ownership of the land. If it be assumed that oil-and-gas royalties are common-law rents,

then they pass to the assignee of the reversion as such, because rents are incident to the reversion. Some courts, however, hold that by a sale of the land, subject to the lease, the lessor sells the mineral interest in the land. This means that the lessee is privileged to mine, but must pay the rents and royalties from production to the owner of the mineral estate at the time the mining is done. Why any different rules than these should apply where the transfer is by will or descent, rather than by deed, is difficult to understand."

Appellants would have this court retract holdings made in *People* v. *Phillips,* 394 Ill. 119, which, in turn, were predicated upon prior decisions of this court cited therein. To do so would of course align this court with the appellants in maintaining unaccrued royalties, under the controlling facts of this case, fall within the scope of the definition of rents set forth in *Crosby* v. *Loop,* 13 Ill. 625. The effect of that would be to also align this court with the Pennsylvania doctrine set forth in *Wettengel* v. *Gormley,* 160 Pa. 559, 28 Atl. 934. Our careful survey of the decisions of the courts of other jurisdictions which have been confronted with the issue here, and which we have set forth in this opinion, clearly demonstrates to us that the great prevailing weight of authority is against holding unaccrued oil or gas royalties are rent, and as a consequence are to be apportioned. The fugacious oil or gas in place under a certain tract of land at a stated time is a part of the land. The fractional portion thereof, which may become royalty oil or gas in the event the underlying oil or gas is found and captured by production to the surface, ceases to be an integral part of the whole of the oil or gas under the particular land tract only when physical separation from the land occurs at the surface. Then, and only then, does the fractional portion, denominated "royalty," become personalty. In the sense of timing, it

464

has "accrued," and may be properly labeled "rent." Before that status is reached the oil or gas is real property, and, in the absence of agreement to the contrary, the lessor owner of the tract of land conveys the oil or gas thereunder when he conveys his land. His grantee succeeds to the title to all, *i.e.*, land, oil and gas. *Tanner* v. *Title Insurance and Trust Co.* 20 Cal. 2d 814, 129 Pac. 2d 383, which holds unaccrued royalty to be something separate from the land it is within, that is, an entity which is an incorporeal hereditament, (a profit *a prende* in land,) analogous to rent, is clearly contrary to *People* v. *Phillips.* Furthermore, the case did not present an issue like the one before us, for the lease in that case contained a provision which, in effect, amounted to a proration of the royalty.

The decision on the issue presented by this case would be the same regardless of whether the subdivision of the whole acreage came about by grant, devise or by operation of the statute controlling descent of intestate property. We agree with Professor Summers on the immateriality of how the subdivision was made; the basic controlling principle would apply in either instance.

The lease in the instant case did not provide for proration of the royalties. To accede to the view of the appellants would amount to a change in the terms of the lease from non-proration to proration without the consent of all the parties thereto. Where the writing actually expresses an agreement, equity cannot make a new one for the parties or add a provision in lieu of another without a prior accord between them for such substitution. *Harley* v. *Magnolia Petroleum Co.* 378 Ill. 19.) The facts that Emma Tyler received delay rentals, and that the same were paid to her children after her death, in the proportion of their acreage, do not reinforce the contentions of appellants. Geneva Hutson was paid such rental by reason of her ownership of acreage in section 4, and she was not paid any of the rental for any interest in the 74 acres.

The appellants complain the lower court taxed the costs against them instead of against the fund involved. Their argument in support is a specious one. To follow it would be tantamount to taxing the costs against appellees who are entitled to the fund.

The decree of the circuit court of Wayne County is affirmed.

*Decree affirmed.*