[L. A. No. 13885.   In Bank.—April 2, 1935.]

STANDARD OIL COMPANY OF CALIFORNIA, Respondent, v. JOHN P. MILLS ORGANIZATION et al., Respondents; C. DOUGLASS SMITH et al., Appellants.

C. Douglass Smith, *in pro. per.*, for Appellants.

F. G. Smith and Todd, Pawson, Watkins & Anderson for Respondents.

THE COURT.—The Standard Oil Company of California commenced this action by filing a complaint in interpleader. Said company purchased oil produced on Block V, Signal Hill, Los Angeles County, from lessees operating wells on said block under a lease providing for a 16⅔ per cent or ⅙ landowner's royalty. . Under the complaint interpleader the

Standard Oil Company deposited in court $71,980.28, the landowner's one-sixth share of the purchase price due from it, and prayed that the court determine conflicting claims thereto. Other companies deposited in court a total of $18,451.61, which likewise represented one-sixth of the price due for oil purchased from operating lessees on said block V.

In 1923, John P. Mills Organization, Inc., was the owner of block V, subject to said oil and gas lease, which provided for a 16⅔ per cent, or one-sixth, landowner's royalty. In that year it subdivided the block into 83 lots, all of which were sold under a plan of subdivision whereby there was to be conveyed to each purchaser of a lot in the block 1/83 of said ⅙ landowner's royalty, or a 1/498 part of all oil and gas produced, saved and sold on said block V. On the theory that the oil royalties sold were securities, the Mills Organization procured a permit from the corporation department of the state of California to sell said lots together with a 1/498 part of oil to be produced from the block with each lot sold. The Mills Organization stated in its application for a permit that the 83 lots with oil rights were to be sold at prices to average $1500 per lot, and on this basis the permit authorized sale of the property at an aggregate price of $124,500.

A provision transferring to each purchaser of a lot "1/498th part of all oil and gas produced, saved and sold on said Block V" was included in all deeds except four, which covered six lots, numbers 37, 57, 61, 60, 67 and 68. Appellants C. Douglass Smith and Ellen Smith, husband and wife, through mesne conveyances, are the owners of lots 60, 67 and 68, and also of eleven other lots, and of an undivided one-half interest in a further lot. The respondents severally are the owners of other lots in block V. The parties stipulated that all wells on block V were on the property of appellants Smith, except for a well on lot 77, which is not involved in the instant action. The sums deposited in court represent amounts due for oil produced from lots 68 and 83, owned by appellants Smith. By virtue of their ownership of the lots from which the oil was produced, they contend that they are entitled to the full amount deposited in court, to the exclusion of the owners of other lots in the block. By appropriate pleadings the parties submitted to the court the question of the oil rights of respond-

ents in the lands owned by appellants Smith, upon which depends their rights in the fund on deposit in court. By the judgment appealed from the court below decreed that the ⅙ landowner's royalty from oil produced, or to be produced, on any lot in block V should be distributed to all lot owners in the block in the proportion of 1/83 of ⅙, or 1/498 of the total production, for each lot owned.

ᵒ The appellants Smith claim the right to all oil produced, and to be produced, not only from lots 60, 67 and 68, which were sold by the Mills Organization to predecessors in interest of the Smiths by deeds omitting the oil clause, but also from lot 83 and other lots now owned by them, which were transferred by the Mills Organization to appellants' predecessors in interest by deeds containing the oil clause. The trial court herein found that the Smiths purchased their lots with full notice of the scheme of subdivision and the plan that all lot owners should share in oil produced anywhere on the block, and in the light of the record could have reached no other reasonable conclusion. Appellants were not original grantees of the Mills Organization as to any lots in block V, and did not become owners of any lots in said block until after all 83 lots had been sold by the Mills Organization.

■ The basic proposition asserted by appellants is that assignments by a landowner of royalty interests cannot create any rights which are enforceable against ·a subsequent grantee of the general estate in the land. This question is determined adversely to appellants in *Callahan* v. *Martin,* L. A. No. 12569 (*ante,* p. 110 [43 Pac. (2d) 788]), this day decided. We there hold that an assignment by a landowner of an interest in his oil rights creates in his assignee an interest or estate in real property which may be asserted against a grantee of the fee in the general estate in the land. It follows from our analysis in *Callahan* v. *Martin, supra,* that the owner of land may convey all or a percentage of his oil rights in described land, retaining the residue of the general estate in the land, or that he may grant surface rights, retaining in himself all or a percentage interest in oil rights in the land. That is, interests in oil rights may be transferred separate and apart from the general estate in the land. ■ But under a deed granting a general estate in the land, the grantee generally succeeds to all oil rights

in the land as an incident to the conveyance, except as such rights have previously been assigned by instruments of which such grantee had actual or constructive notice, or are reserved by the deed.

Where a parcel of land subject to a single oil and gas lease is subdivided by deeds which contain no reference to oil rights, there is a conflict of authority in the few cases where the question has arisen as to whether the landowner's royalty on oil thereafter produced goes entirely to the owner of the section on which the oil has been brought to the surface, or is to be apportioned among the several lot owners. The question also arises where land is partitioned among heirs upon the death of the landowner-lessor. The problem is the subject of three annotations in American Law Reports. (*Pittsburgh & West Virginia Gas Co.* v. *Ankrom,* 83 W. Va. 81 [97 S. E. 593, 5 A. L. R. 1157, note 1162]; *Musgrave* v. *Musgrave,* 86 W. Va. 119 [103 S. E. 302, 16 A. L. R. 564, note 588]; *McIntire* v. *Bond,* 227 Ky. 607 [13 Pac. (2d) 772, 64 A. L. R. 630, note 634].)

We are of the view that the decisions holding for the rule of apportionment best accord with the principles laid down in *Callahan* v. *Martin, supra,* this day decided, and in other decisions of the courts of this state, as to the nature of the interest of the landowner, his lessee, and assignees of oil royalty. Therefore, in the instant case, during the continuance of the oil lease to which block V was subject at the time of its subdivision by the Mills Organization, even in the absence of any provisions in regard to oil rights in the deeds to the 83 lots of approximately equal size, each lot owner would be entitled to 1/83 of ⅙ landowner's royalty, or 1/498 part thereof for each lot owned. The sum of more than $90,000 deposited in court in the actions herein was produced under the lease in effect at the time of subdivision by the Mills Organization, and was apportionable in the ratio of 1/498 part for each lot owned, as decreed by the court below. But the court did not limit its decree to oil produced while the lease continued, but in response to the prayer of the respondents undertook to determine their oil rights in this ratio for all time. The omission of the oil clause in deeds to six of the lots may affect the rights of the owners of these lots, as will hereafter appear.

The most recent of the American Law Reports notes, cited above, is appended to the case of *McIntire* v. *Bond,* 227 Ky. 607 [13 Pac. (2d) 772, 64 A. L. R. 630], which case clearly states the reason for the rule of apportionment. In that case oil royalty is regarded as rent, an incorporeal hereditament, issuing from the profits of land and payable by the lessee in consideration of the privileges and estate vested in him under the lease. This is in accord with the principles we have this day stated in *Callahan* v. *Martin, supra.* It has sometimes been said that compensation paid for privileges comprising an incorporeal hereditament cannot be classed as rent. But this view has been criticized (Cooley's Blackstone, vol. 1, p. 468; Thompson on Real Property, vol. 1, p. 319), and has been quite generally rejected by the courts, including the Supreme Court of the United States. (*United States* v. *Noble,* 237 U. S. 74 [35 Sup. Ct. 532, 59 L. Ed. 844].) The view that rent or royalty is not to be apportioned in the situation under consideration rests largely on the theory that the royalty is a payment for oil removed, due the owner of the parcel from which it is taken. The Supreme Court of West Virginia, in *Campbell* v. *Lynch,* 81 W. Va. 374 [94 S. E. 739, L. R. A. 1918B, 1070], at first adopted the rule of apportionment, but its later decisions in *Pittsburgh & West Virginia Gas Co.* v. *Ankrom, supra,* and *Musgrave* v. *Musgrave, supra,* are generally regarded as overruling *Campbell* v. *Lynch.* The strong dissenting opinion of Poffenbarger, J., in *Musgrave* v. *Musgrave,* is quoted by the court in *McIntire* v. *Bond, supra,* as follows:

"The error in the assumption necessary to these decisions [assumption that rent or royalty is a return for the right to take oil from the land whence the oil is taken] is so well pointed out in the dissenting opinion of Judge Poffenbarger in the Musgrave case that we quote from it: 'Manifestly it is that, but it is just as clearly something more than that. Besides paying for the oil taken out, it holds the lease on all of the land and oil included within its boundaries. It maintains the lessee's right to carry his operations to every part of the tract and precludes operation or mining on any part of it by the owner and everybody else except assignees of the lessee. How then can it be said to be only pay for the oil taken out? A full and true definition of anything

must accord fully with its nature and characteristics. "A definition is a description of a thing by its properties or a conception by its attributes." Webster. As a royalty does more in fact and in law than pay for the oil taken out, a description of it, calling it pay for oil taken out, is true as far as it goes, but it stops short of revelation or narration of its complete nature and character. Any intelligent layman on the street knows it does more than that and no lawyer can maintain his client's case in any court, upon the proposition that the royalty only pays for the oil taken out.'" (To the same point, see, *Wettengel* v. *Gormley*, 160 Pa. 559 [28 Atl. 934, 40 Am. St. Rep. 733]; *Keystone Gas Co.* v. *Allen*, 227 Ky. 801 [14 S. W. (2d) 155].)

The owners of separate parcels into which the fee in the land has been subdivided have no right to drill upon their lots while the lease continues, and cannot require the lessee to drill offset wells on their lands, since the burden the lessee assumes by the lease cannot be enlarged. The oil brought to the surface upon one of the several parcels into which the property has been subdivided may in fact be drawn from beneath the surface of the other parcels.

The author of the annotation in 64 A. L. R. 634, to illustrate his point that the rule denying apportionment is most unjust and inequitable, cites *Galt* v. *Metscher*, 103 Okl. 271 [229 Pac. 522]. In that case the lessee, in an effort to protect the holders of the two parcels of land into which a tract had been divided, attempted to locate a well partly on one parcel, partly on the other, but through mistake placed it entirely on one parcel. Nevertheless, the court felt compelled to apply the rule in that jurisdiction denying apportionment. The commentator further states, at page 639: "It cannot fairly be said to have been the intent of the parties that, if the lessee happened to locate the well upon the tract purchased, the owner of the tract would thereby be enabled to obtain a royalty not only on the oil and gas actually in the land within his boundaries, but also on that in the adjoining lands subject to the same lease. It was not the intent of the parties that either of them should be placed in a position where they would be helpless to protect their right to a royalty upon oil produced from their land, should the lessee, either through the exercise of his best judgment, or through caprice, perform the terms of his

contract by drilling wells upon the adjoining tract, especially where the grantee paid a sum of money for the land explainable only upon the theory of the expected profits from operations under the lease.''

We conclude that while the lease on block V at the time of the subdivision thereof by the Mills Organization continues in effect, each lot owner in said block is entitled to 1/498 part of oil produced anywhere on the block for each lot owned, regardless of the omission of the oil clause in several of the deeds. ██ We now pass to consider the effect of the omission of the oil clause in several of the deeds as to the rights of the parties in the event of a termination of the lease.

When the Mills Organization conveyed the first of the 83 lots in block V, together with a ''1/498th part of all oil and gas produced, saved and sold on said Block V,'' it granted to the purchaser a 1/498 royalty interest in the oil rights on each and every other lot in the block, and by necessary implication reserved and excepted all oil to be produced on the lot conveyed except a 1/498 part thereof, 82/498 being reserved to be transferred with other lots. As the Mills Organization sold other lots this process of grant, reservation and exception of oil rights continued. All except a few of the lots were sold by the Mills Organization in 1923. The four deeds to the six lots inadvertently omitting the oil clause were, except for a deed executed on December 3, 1926, covering lots 52 and 53, the last deeds to be executed by the Mills Organization. Said deeds were dated, respectively, December 9, 1924, May 7, 1926, July 9, 1927, and July 25, 1927.

Of the six lots sold without the oil clause, appellants Smith, as noted above, now own lots 60, 67 and 68. The present owners of the other three lots, 37, 57 and 61, and also the owners of lots 52 and 53, join with the other respondents in praying that it be adjudged that each lot owner in the block is entitled to 1/498 part of the oil produced anywhere on the block for each lot owned, and appellants Smith are the only owners to claim the full 83/498 or 1/6 of oil produced on lots owned by them. Appellants Smith deraign title to lots 67 and 68 through one Mitchell, who received a deed from the Mills Organization omitting the oil clause of date July 9, 1927. At the time of the con-

veyance to Mitchell of lots 67 and 68, and also lot 57, by said deed, all 83 lots with the exception of these three and lot 60 had passed from the Mills Organization. Of the seventy-nine lots sold, all except two, lots 37 and 61, had been transferred by deeds containing the oil clause, which were duly recorded. That is, seventy-seven lots had been transferred by deeds containing the oil clause. Therefore, the most that the Mills Organization could have transferred to Mitchell by express provision in the deed to him for lots 57, 67 and 68, was 6/498 of the oil to be produced from each of said lots, and this, therefore, is the greatest percentage that could vest in him, and through him in appellants Smith, by reason of the omission of the oil clause in said deed of July 9, 1927. (We are here dealing with the 83/498, or $\frac{1}{6}$ interest, not with rights of appellants in the $\frac{5}{6}$ working interest which would be released upon the termination of the existing lease.) The same analysis applies to the grant of lot 60, on July 25, 1927, to Polk and Lilly. The lot, also, is now owned by appellants Smith.

The result would be, if appellants Smith are entitled to a 6/498 interest as to lots 60, 67 and 68, the respondent owners of lots 37, 57 and 61, the other three lots transferred without the oil clause, have no oil rights in appellants' lots 60, 67 and 68, and appellants have no rights in respondents' lots 37, 57 and 61. The owners of the seventy-seven lots transferred by deeds with the oil clause have rights in lots 60, 67 and 68, and also 37, 57 and 61, by virtue of the express provision in their deeds. ▮ However, there are circumstances which prevent appellants Smith from denying the rights of the owners of lots 37, 57 and 61, in oil produced on their lots 60, 67 and 68. The omission of the oil clause was inadvertent, and contrary to the understanding of the parties that a perpetual 1/498 interest in oil produced anywhere on the block passed with each lot. The holders of said deeds could have brought actions for reformation. The record herein shows that the owners of lots 60, 67 and 68 joined with other lot owners in block V in opposing the claims of one Toms and wife, owners of lot 77, who claimed all oil produced therefrom, in a prior action, C–1159 in the Superior Court of Los Angeles County. We shall have more to say of this action in discussing appellants' claim of *res judicata*. In said prior action the owners of lots 60, 67

and 68 joined with the owners of other lots, including lots transferred without the oil clause, in alleging in their pleadings and contending during the trial that the transaction should be construed as vesting in each lot owner 1/498 part of oil produced anywhere on the block. As to the owners of lots 60, 67 and 68, this was tantamount to a written reformation by agreement between them and other lot owners. Similar allegations were contained in pleadings in another action, 240,990, in the Superior Court of Los Angeles, and Mitchell also accepted payments of 1/498 part for each lot owned by him on account of oil produced on an early well on block V. The respondent owners of lots 37, 57 and 61 have not appealed from the judgment, which gives the Smiths, as to lots, 60, 67 and 68, rights in lots, 37, 57 and 61 to the extent of 1/498 for each of said lots 60, 67 and 68.

As to the rights of the owners of the six lots which were transferred without the oil clause to share in oil produced on the seventy-seven lots conveyed with said clause, the effect of the inadvertent omission was to give said owners of the six lots no rights in oil produced on any lot other than the particular lot conveyed, and to leave in the Mills Organization 6/498 of the oil produced on each of said seventy-seven lots. Such 6/498 part of oil in each of said seventy-seven lots would not pass to the respective grantees of the fee in each of said lots, since such grantees by the terms of their deeds were limited to only 1/498 for each lot, including the lot granted in fee. The effect of the judgment herein is to vest in the owners of each of said six lots a 1/498 interest in oil produced on each of the other seventy-seven lots (or really seventy-six lots, since it was agreed that lot No. 77, which had been the subject of a prior action, C–1159, to be hereafter noticed, was not involved in the action herein). The Mills Organization, in which remained the 6/498 undisposed interest as to each of the other seventy-seven (or seventy-six) lots, was a party to the action herein, and by the form of its pleadings consented to said six lot owners sharing in oil produced on the other seventy-six lots, in the proportion of 1/498 interest for each lot. The Mills Organization has not appealed from the judgment herein. It has thus, in effect, in a large measure corrected its inadvertent failure, through omission of the oil clause,

to give said six lot owners rights in the other seventy-seven lots.

■ The only point remaining to be considered is the effect of the judgment in two prior actions involving block V. Appellants Smith contend that the decree in action C–1159 in the Superior Court of Los Angeles is *res judicata* of issues in the instant case, and compels entry of a judgment in their favor. Respondents rely on a judgment in former action 240,990 in the same court. The judgment in this action antedated the judgment in action C–1159. In case of two conflicting judgments the later in time controls. (15 Cal. Jur. 104, and cases there cited.) Furthermore, said judgment did not determine the oil rights of the various lot owners who participated therein, but established that the lease covering block V, as to which there had been an attempted cancellation, without the consent of the lot owners, was in full force and effect.

■ Nor can we accept appellants' argument that the judgment in action C–1159 compels judgment herein in their favor. In said action Ernest G. Toms and wife and Leonard E. Rowe, owners of lot 77, block V, brought suit to quiet title to lot 77 against the claims of other lot owners in said block to participate in oil produced and to be produced on lot 77. The court held that the owners of other lots in said block who appeared as answering defendants or as interveners had no interest or estate in lot 77, or oil to be produced therefrom. As indicated by the pleadings and decree and a stipulation filed in said action, it involved the question of the rights of various lot owners in said block V in oil produced on other lots by virtue of the subdivision of said block by the Mills Organization and the inclusion in the deeds to grantees of a transfer of ''1/498 part of all oil and gas produced, saved and sold on said Block V''. However, it is fundamental as to the doctrine in *res judicata* that before the former adjudication may operate as an estoppel as to issues in the later action, there must be an identity of parties, as well as an identity of issues. The subsequent action must be between the parties or their privies. (2 Freeman on Judgments, p. 1414; 1 Freeman on Judgments, p. 887; 15 Cal. Jur. 181, and cases cited in these two texts.) It is also a general principle in the field of *res judicata* that parties to a judgment are not bound by it in a

subsequent proceeding or controversy between them, unless they were adverse parties in the original action. (1 Freeman on Judgments, p. 918; 15 Cal. Jur. 186.)

In the case herein, after the taking of evidence had concluded it was stipulated between appellant C. Douglass Smith, representing himself *in propria persona,* and his wife, on the one side, and Attorney Cecil H. Phillips, for respondent lot owners, "that the parties in the Toms' action [C–1159] were also the parties in this action or their successors in interest". Even without this stipulation the identity of certain of the parties in the instant action with the parties in C–1159 is established by comparing the parties in the two actions, as their names appear in the records before us. It also appears from examining said records, that in the instant action the owners of all 83 lots, except three—77, 9 and 74—appeared by counsel. In action C–1159 owners of only 50 lots appeared as answering defendants or interveners. The action was dismissed as to four defendants in action C–1159, all of whom are parties in the instant action. Thus it appears that as to a considerable number of lot owners, they either were not made parties to action C–1159, or said action was dismissed as to them. The Phillips' stipulation, in the light of the circumstances which caused it to be made, was not intended and should not be construed to extend the binding force of the prior judgment to persons who appear from the record not to have been parties thereto, themselves or by their predecessors.

As to those lot owners who were parties to the prior action, the judgment is not binding on them in the instant case in favor of appellants Smith because in said prior action the predecessors in interest of appellants Smith and the owners of said lots were not adverse parties, but cooperating parties, who as answering defendants or interveners joined in urging the claim that each owner of a lot in block V was entitled to participate in oil produced anywhere on block V by virtue of the oil clause in the deeds from the Mills Organization. In action C–1159 the adversary parties were plaintiffs Toms and Rowe on the one side, and the defendant and intervening lot owners on the other. The rule that parties to a judgment are not bound by it in a subsequent proceeding or controversy between them unless they were adverse parties in the original action is embodied in section 1910 of the

Code of Civil Procedure. (1 Freeman on Judgments, p. 918; 34 C. J. 1040; 15 R. C. L. 1013; 15 Cal. Jur. 186; Black, Judgments, 2d ed., sec. 599; Bigelow, Estoppel, 6th ed., p. 113; *Victor Oil Co.* v. *Drum*, 184 Cal. 226 [193 Pac. 243]; *Hubermann* v. *National Surety Co.*, 37 Cal. App. 569 [174 Pac. 79]; *Hentig* v. *Johnson*, 8 Cal. App. 221 [96 Pac. 390]; *Robeson* v. *Superior Court*, 171 Cal. 588 [154 Pac. 8]; *Estate of Heydenfeldt*, 127 Cal. 456 [59 Pac. 839].) Smith is the successor in interest of lot owners who either were not parties to action C–1159, or of lot owners who as parties to said former action joined with lot owners who are respondents in the instant action, or their predecessor in interest, in urging the claim that each lot owner shared in the proportion of 1/498 part of oil for each lot owned. The former judgment is not binding on them to the point that they have no oil rights in lots now owned by the Smiths.

The judgment is affirmed.