[L. A. No. 14977. In Bank.—January 29, 1937.]

A. F. SCHIFFMAN, Respondent, v. RICHFIELD OIL COMPANY OF CALIFORNIA (a Corporation), Appellant.

Gibson, Dunn & Crutcher, George W. Nilsson, H. F. Prince, Homer D. Crotty and Robert T. Schwarz for Appellant.

Woodruff, Musick & Hartke, Woodruff, Burr & Smith and Philip Grey Smith for Respondent.

Williamson, Ramsay & Hoge and Fulton Hoge, as *Amici Curiae* on Behalf of Respondent.

SEAWELL, J.—Plaintiff A. F. Schiffman brought this action for an accounting against defendant Richfield Oil Company of California, a corporation, which is the appellant herein. Plaintiff contends that by virtue of participating oil agreements which were issued to him by the Monrovia Oil Company he is entitled to share in the proceeds of oil produced from a certain well by defendant Richfield Company. Said company by mesne assignments has suc-

ceeded to the interest of the Monrovia Oil Company as sub-lessee of the premises from which the oil is being produced. It contends that the participating oil agreements were the personal obligation of the Monrovia Oil Company by whom they were issued, and gave plaintiff no rights in the proceeds of oil produced by the defendant company.

Upon the first trial of this action the court rendered judgment that plaintiff take nothing, but thereafter granted a new trial on the ground of insufficiency of the evidence. By stipulation the action was retried upon the transcript of testimony taken at the former trial. The judgment upon the second trial was rendered by a different judge, who sustained plaintiff's right to 8.73 per cent of the net proceeds of the oil produced by defendant Richfield Company from said well.

The premises from which the oil is being produced are situate in the Signal Hill district of Los Angeles County. On May 20, 1921, the owners of the freehold executed an oil lease to Oceanic Oil Company, a copartnership, providing for payment of a 16 2/3 per cent royalty to the lessors. On September 6, 1922, the Oceanic Oil Company executed a sublease covering a portion of the premises in favor of R. L. Casner. This sublease provided for payment of a 33 1/3 per cent royalty to the Oceanic Oil Company, the sublessor, which agreed to pay the 16 2/3 per cent royalty to the original lessors. By an assignment bearing the same date as the sublease, Casner assigned the sublease to Monrovia Oil Company by whom the participating oil agreements held by plaintiff were issued. Said plaintiff drilled the producing well on the property. Thereafter, by assignment dated October 11, 1927, it transferred the sublease to Brownmoor Oil Company, a corporation, which by assignment dated November 16, 1927, transferred it to defendant Richfield Oil Company. These two assignments were both recorded on November 30, 1927.

The consideration received by Monrovia Oil Company from the Brownmoor Oil Company was converted into cash and distributed to Grover Lawler, Robert Lee Casner and Georgia Casner, his wife, holders of certificates of beneficial interest in the Monrovia Oil Company, a Massachusetts Trust, as will be explained more fully hereinafter. The Brownmoor Company received 11,000 shares of stock of the Richfield

Company of the par value of $25 upon its transfer to said company.

The participating oil agreements held by plaintiff were purchased by him for cash in the sum of $26,400 between November 10, 1922, and September 25, 1926. By said instruments the Monrovia Oil Company assigned to plaintiff stated percentages of the proceeds to be ''derived and received . . . from the sale or other disposal of sixty-six and two-thirds (66 2/3) Per Cent of net production'' of the well which should remain after payment of expenses. The court found that the Brownmoor Company and the Richfield Company acquired the sublease with notice of said participating oil agreements, which finding is sustained by the evidence.

Defendant's case involves two main arguments. The Monrovia Oil Company was organized as a Massachusetts Trust. The declaration of trust gave the trustees the exclusive power of management, with legal title and full authority in their discretion to sell a part or the whole of the trust property, and to distribute the net proceeds to the beneficiaries of the trust. It is the contention of defendant that plaintiff and others to whom participating oil agreements were sold in legal effect were the beneficiaries of the trust estate, and that by virtue of the above authorization contained in the declaration of trust, the trustees were empowered to sell the sublease free and clear of any claims of plaintiff and others, the right of such persons being to share in the proceeds received by the trustees from the sale.

Defendant's further contention is that if the participating oil agreements are not the certificates of beneficial interest provided for by the trust, and plaintiff's rights are measured by the terms of the participating agreements alone, nevertheless said agreements created only the personal obligation of the Monrovia Oil Company, and did not give plaintiff any interest in oil produced after the Monrovia Company had assigned the sublease. We are in accord with the judgment of the trial court rejecting both these contentions. We shall first set forth the reasons for our conclusion that the participating oil agreements were not certificates of beneficial interest provided for by the declaration of trust.

The Monrovia Oil Company was organized on or about August 21, 1922, with three trustees. The original trustees were dummy trustees, and were soon replaced by Robert

Lee Casner, Georgia Casner, his wife, and Grover Lawler. The declaration of trust provided that the ''capital, so-called of this trust, shall be divided into Five Thousand (5,000) equal beneficial interests, and shall have the par value of One Hundred ($100) Dollars per beneficial interest''. The holders of beneficial interests were to receive a certificate showing the number of their interests in a form determined by the trustees. Only three certificates of beneficial interest were ever issued, and at all times these were held by Mr. and Mrs. Casner and Lawler. The form of the certificates does not appear. The consideration which said persons gave for the certificates is not shown in the instant case. In the decision of the federal Circuit Court of Appeals in *Monrovia Oil Co.* v. *Commissioner of Internal Revenue*, 83 Fed. (2d) 417, it is said that said certificates of beneficial interest ''were sold, under permit from the California corporation commissioner, at a par value of $10 each, instead of the $100 stated in the declaration of trust, to Lawler, and Mr. and Mrs. R. L. Casner''.

As noted above, the sublease granted to Casner on September 6, 1922, by the Oceanic Oil Company, and by him assigned to the Monrovia Oil Company on the same date, provided for a 33 1/3 per cent royalty to the sublessor, from which it agreed to pay the 16 2/3 per cent royalty due the lessor under the original lease. This left 66 2/3 per cent of the oil production which the sublessee was entitled to retain. This production was divided into 2,000 units by the Monrovia Oil Company, the sublessee, and participating oil agreements issued for all of said units, representing the full 66 2/3 per cent of the oil produced. Said agreements provided for deduction of operation expenses before payment of the proceeds of the oil produced to the agreement holders.

Casner, one of the trustees, received an agreement for 800 units in consideration of transferring the sublease to the Monrovia Company. John McKeon, who drilled the well, received 200 units in part payment of his compensation, and the 1,000 units remaining were sold to the public at $100 a unit, plaintiff buying 264 units. It does not appear that the Monrovia Oil Company ever owned any property except this sublease, the personal property used in connection therewith, and the funds derived from the sale of participating oil agreements. As the right to receive the net proceeds

of the full 66 2/3 per cent of the oil which the sublessee (Monrovia Oil Company) was entitled to retain under its sublease was assigned to the holders of the participating agreements, no part of the proceeds of the oil would remain for division among the holders of the certificates of beneficial interest in the trust, that is, the Casners and Lawler. Only the net proceeds, however, were distributable, and it was contemplated that Lawler and Casner, trustees, should receive a salary. Casner, as noted above, held in addition to his certificate of beneficial interest, a participating oil agreement for 800 units. It was evidently contemplated from the first that participating agreements should be issued, since an application for a permit was mailed to the commissioner of corporations the day the company was organized.

We are of the view that a distinction between the certificates of beneficial interest and the participating oil agreements must be maintained. Lawler, one of the holders of the three certificates of beneficial interest, and for a time one of the three trustees, testified that plaintiff and another investor were unwilling to invest in the enterprise if there was any possibility of their becoming liable for debts incurred in operation of the well. Fearing that there might be a possibility of liability to third persons upon the holders of certificates of beneficial interest as *cestuis* of the trust, which probably would not have been the case in view of our decision in *Goldwater* v. *Oltman*, 210 Cal. 408 [292 Pac. 624, 71 A. L. R. 871], participating oil agreements were issued on the theory that thereby freedom from liability would be assured. According to the testimony of Lawler, permission was secured from the corporation commissioner for issuance of both types of instruments—the certificates of beneficial interest and the participating oil agreements.

The declaration of trust provided that the "capital, so-called" of the trust should be divided into 5,000 equal beneficial interests of the par value of $100 each, for which certificates of beneficial interest should be issued. The participating oil agreements provided that the net proceeds received by the Monrovia Oil Company from the well should be divided into 2,000 participating agreements. Said agreements were sold at the rate of $100 a unit. The participating agreements gave the purchaser a right to share in the proceeds of production from one well only, and thereunder

purchasers would have no right in the proceeds of other trust property. The trust instrument gave the trustees broad powers to acquire and sell property of all kinds, and beneficiaries of the trust would have the right to share in the net proceeds from the sale of all property of the trust of whatever kind.

The declaration of trust provided that the *cestuis* should have no interest in the profits as such. The participating agreements specifically assigned a share in the net proceeds, that is, from the operation of the well. The trust declaration provided that the holders of beneficial interest should have no legal interest in the trust assets. The participating oil agreements gave the purchasers thereof a lien upon the interest and estate of the trustees in the lease in the event of a default in payment of oil proceeds to the agreement holders.

Plaintiff purchased participating oil agreements, not certificates of beneficial interest. Although he testified that the declaration of trust was exhibited to him at one time, there is absolutely no showing that he was informed that the participating oil agreements were certificates of beneficial interest, or that the trustees were authorized by assignment of the sublease to terminate his rights in the oil proceeds. In fact, there is evidence, alluded to above, that plaintiff did not wish to become the holder of certificates of beneficial interest because of a fear that they might involve him in liability for debts of the enterprise.

The trustees were authorized to sell interests in the oil to be produced, or the proceeds thereof, by means of participating oil agreements under that provision of the declaration of trust which gave them broad powers to sell, encumber and contract for or concerning any property of the trust with full powers as if absolute owners. Plaintiff has the same rights he would have in the oil proceeds if he had purchased similar participating oil agreements from a corporation or a single individual. The agreement is the measure of his right. It is not qualified by the provisions of the trust declaration giving the trustees the right to sell all trust property. By the participating agreements the trustees transferred from the trust to the purchasers of the agreements percentages of the proceeds of oil to be produced. The

interest of such purchasers were not thereafter trust property which the trustees were authorized to sell.

There is nothing in the decision in *Monrovia Oil Co.* v. *Commissioner of Internal Revenue, supra,* at variance with our conclusion. It was there held that the Monrovia Oil Company, together with the agreement holders, constituted an ''association'' within the meaning of the revenue act, with the result that sums paid the agreement holders were taxable as income to the Monrovia Oil Company in the same manner as the income from which dividends are paid by a corporation to its stockholders is taxable to the corporation. The purchasers of participating oil agreements joined in a common enterprise for the transaction of business through a centralized management. The decision did not hold that the participating agreements were certificates of beneficial interest. That the court did not consider that the separate identity of the two classes of instruments had been merged is indicated by the following remark: ''The financing of this enterprise was carried on not by the issuance of certificates of beneficial interest, but by the sale of transferable contracts called 'Participating Oil Agreements'.'' (83 Fed. (2d) 417, 418.)

■ Plaintiff is not barred from asserting that the participating oil agreements were not certificates of beneficial interest by reason of having referred to said agreements in the complaint as ''certificates'', and as ''beneficial interests in said trusts''. Defendant was not misled thereby.

■ This brings us to the second of defendant's major arguments—that under the participating oil agreements construed alone and without reference to the trust declaration, plaintiff has no rights in the proceeds of oil produced by defendant as transferee from the Monrovia Oil Company of the sublease. The plaintiff's participating oil agreements were not recorded until after the transfer to the Richfield Company. But the trial court found that the Brownmoor Oil Company and the defendant Richfield Oil Company, through its vice-president and production manager, John McKeon, had notice and knowledge of the participating oil agreements. McKeon negotiated for the transfer of the sublease to appellant Richfield Company. He arranged the price and other terms of the transfer from the Brownmoor

Oil Company to the Richfield Company, and as vice-president he signed the agreement for the transfer.

McKeon had been president of the Oceanic Oil Company, a copartnership, which executed the sublease providing for a ⅓ lessor's royalty, which sublease was transferred by Casner, the sublessee, to Monrovia Oil Company on the day it was executed. Prior to his connection with the Richfield Company McKeon had also been engaged in the business of drilling oil wells. In 1922 he was employed by the Monrovia Oil Company to drill the well involved in this action. As part of his compensation he received participating oil agreements for 200 units which were identical with those purchased by plaintiff at $100 a unit. The Monrovia Oil Company or its trustees subsequently sold McKeon's units for him for cash.

The transfers of the sublease to the Brownmoor Company and to the Richfield Company did not take place until 1927. Appellant contends that it is the law that knowledge or notice which an agent has acquired before the commencement of his agency is not imputable to his principal unless it is actually present in the mind of the agent when he acts on behalf of his principal. (*Harrington* v. *United States* (*Distilled Spirits*), 11 Wall. (U. S.) 356 [20 L. Ed. 167]; *Bogart* v. *George K. Porter Co.,* 193 Cal. 197, 210 [223 Pac. 959, 31 A. L. R. 1045]; *Cooke* v. *Mesmer,* 164 Cal. 332, 338, 339, [128 Pac. 917]; *Christie* v. *Sherwood,* 113 Cal. 526, 530 [45 Pac. 820]; *Wittenbrock* v. *Parker,* 102 Cal. 93, 103 [36 Pac. 374, 41 Am. St. Rep. 172, 24 L. R. A. 197].)

In the light of the evidence as to what took place preceding the transfer to Richfield Oil Company, we are of the view, as was the trial court, that McKeon at the time of said transfer must have had in mind the fact of his drilling the well and the issue of participating oil agreements to himself and to others. McKeon admitted that he had the instruments "vaguely in mind". We are in accord with the further observation of the trial court in its opinion that even if the statements made to McKeon preceding the transfer did not recall to him his prior connection with the enterprise, nevertheless without regard to any such prior connection, such statements were sufficient to place upon him, acting for the Richfield Company, a duty of inquiry, and to charge

him with knowledge of such facts as an investigation would have revealed.

By its findings and judgment for plaintiff the trial court resolved any conflicts in the evidence in his favor. Mr. Lawler, for a time one of the trustees of the Monrovia Oil Company, had negotiated with McKeon in July, 1927, for the transfer of the sublease to the Richfield Company. Lawler had rejected McKeon's suggestion of a transfer in exchange for stock of the Richfield Company, rather than cash, because, he told McKeon, this would not be acceptable to the "small interest holders, who were holders of participating oil agreements". He exhibited to McKeon powers of attorney which he had procured from about two-thirds of the agreement holders. Before consummation of the transfer to the Richfield Company McKeon, fearing that Lawler might make a claim for a commission upon Richfield, arranged that the Brownmoor Company should pay him $5,000, and this sum he turned over to Lawler, who had first offered the sublease to the Richfield Company, and who represented that he had been at some labor and expense in procuring powers of attorney from participating agreement holders.

McKeon either failed to make the investigation plainly indicated as to the rights of plaintiff and others under the participating oil agreements, or failed to inform others in the employ of the company whose particular duty it was to examine titles that investigation should be made, or he acted in the belief that as a matter of law said instruments were the personal obligation of the Monrovia Oil Company only and gave the holders no claim upon a transferee of the sublease. Defendant company herein argues for the adoption of this conclusion by this court, but we are unable to agree. The transfer of the sublease to the Richfield Company was made before a number of recent decisions discussing the nature of oil royalties. However, it would seem that the defendant company may have the right to a part of the oil produced by it under the sublease. There can be no doubt that the transfers to the Brownmoor Company and to the defendant Richfield Company were plainly worded to transfer the sublease free of any interest in plaintiff and others in the proceeds of oil to be produced, and if it had been within the power of the transferors they would have had that effect. R. L. Casner, one of the trustees and presi-

dent of the Monrovia Oil Company, participated in the attempted assignment to the Brownmoor Company free and clear of any claims of plaintiff and others, and that company transferred its interest to the Richfield Company. Casner held 800 of the 2,000 oil units issued by Monrovia Oil Company. In the circumstances shown he would be estopped to claim that such rights as he had at the time of the transfer to the Brownmoor Company did not pass to it and from it to the Richfield Company.

This brings us to a consideration of the theory on which it must be held that the defendant Richfield Company, as transferee of the sublease from the Monrovia Company with notice, must recognize the rights of plaintiff in the proceeds of oil produced by said defendant. In *Western Oil etc. Co.* v. *Venago Oil Corp.,* 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271], the lessee assigned percentages of oil and other substances ''to be produced, saved and sold under the terms of a certain lease''. Applying the doctrine of potential possession of the law of sales of personal property, we held that the lessee had potential possession of the oil to be produced and severed from the real property by reason of his lease covering said property, and that the percentage assignments operated as so-called present sales of potential personal property. (*Western Oil etc. Co.* v. *Venago Oil Corp.,* 218 Cal. 733, 738–742 [24 Pac. (2d) 971, 88 A. L. R. 1271] ; for discussion of doctrine of potential possession see 1 Williston on Sales, 2d ed., pp. 256–269.) The assignee's title attached to his undivided interest in the oil produced by a transferee of the leasehold. Appellant Richfield Company contends that the doctrine of this case is not applicable herein for the reason that the assignments made by the Monrovia Oil Company were not of percentages of the oil ''to be produced, saved and sold'', but of percentages of the proceeds to be derived from sale or other disposal of the oil produced. The assignments in the instant case, appellant contends, are personal covenants of the Monrovia Oil Company for payment of sums of money, and are not binding upon defendant as assignee of the sublease.

In *Western Oil etc Co.* v. *Venago Oil Corp., supra,* we did not hold that the percentage assignments vested in the assignees an interest in real property. Since our decision in that case we have held that certain royalty assignments made

by landowner-lessors operated as transfers of interests in real property. (*Callahan* v. *Martin*, 3 Cal. (2d) 110 [43 Pac. (2d) 788, 101 A. L. R. 871] ; *Standard Oil Co.* v. *J. P. Mills Organization*, 3 Cal. (2d) 128 [43 Pac. (2d) 797] ; *Dabney-Johnston Oil Corp.* v. *Walden*, 4 Cal. (2d) 637 [52 Pac. (2d) 237].) Respondent urges us now to hold that said cases establish the character of the assignments to him, which were made by a lessee, in this case a sublessee, rather than by a landowner-lessor. For reasons which we will state we are unwilling in the instant case to thus apply the cited cases.

In the above cases the landowner had executed an oil lease providing for a landowner's royalty or rental measured by a percentage of the oil to be produced under the lease, or the proceeds therefrom. Thereafter he executed assignments of percentages of the oil and other substances to be produced, or the proceeds therefrom. These royalty assignments were not limited to oil to be produced under the existing lease, but were without limitation as to time. We held that while the lease continued the royalty assignments by the landowner-lessor operated as partial assignments of the royalty or rental due him from the lessee. Upon the termination of the lease, the royalty assignees would become tenants in common with each other, and with the lessor if he had retained an interest, in the profit *à prendre* to develop and produce oil. The right of profit survives the conveyance of the fee in the general estate in the land, and gives the royalty assignee the right to receive his percentage of the proceeds from whoever produces oil on the premises.

The right to unaccrued rent (lessor's royalty) is an incorporeal hereditament. (Sec. 802, subd. 4, Civ. Code; *Standard Oil Co.* v. *J. P. Mills Organization*, 3 Cal. (2d) 128, 134 [43 Pac. (2d) 797] ; *Callahan* v. *Martin*, 3 Cal. (2d) 110, 118–124 [43 Pac. (2d) 788, 101 A. L. R. 871] ; *McIntire* v. *Bond*, 227 Ky. 607 [13 S. W. (2d) 772, 64 A. L. R. 630; *Arrington* v. *United Royalty Co.*, 188 Ark. 270 [65 S. W. (2d) 36, 90 A. L. R. 765].) A profit *à prendre* to drill for and produce oil is also an incorporeal hereditament. (*Callahan* v. *Martin*, *supra*, at pp. 118–122; *Dabney* v. *Edwards*, 5 Cal. (2d) 1 [53 Pac. (2d) 962, 103 A. L. R. 822] ; *Dabney-Johnston Oil Corp.* v. *Walden*, 4 Cal. (2d) 637, 649 [52 Pac. (2d) 237].) An incorporeal hereditament is an interest in real property, which, if it is to endure for years,

is a chattel real, but if it is in fee it is real estate or real property. (*Callahan* v. *Martin, supra,* at p. 120; *Dabney* v. *Edwards, supra; Dabney-Johnston Oil Corp.* v. *Walden, supra,* at p. 649; *Barlow* v. *Security Trust & Sav. Bank,* 197 Cal. 263 [240 Pac. 19].)

■ The effect of the above decisions is that an owner of land may create a cotenancy in the right which he has to drill for and produce oil. If the landowner may do this, a lessee to whom the landowner has transferred the exclusive right to drill for and produce oil during the term of the lease, is also in a position to create a cotenancy in the right of profit to produce oil, to continue during the term of the lease. (See 25 Cal. Law Rev. 229.) Plaintiff contends that this is the effect of the instruments issued to him. That is, plaintiff contends, said instrument vested in him not merely an interest in the oil to be produced, or the proceeds therefrom, but an interest in the leashold estate. In this analysis, the instruments held by plaintiff were assignments of an undivided interest in the leasehold estate, that is, in the profit *à prendre* to drill for and produce oil.

■ But the lessee, unlike the average landowner-lessor or purchaser of royalty interests, is often equipped to operate an oil-production enterprise and has acquired the lease for that purpose. In the instant case, the assignments to plaintiff and others specifically reserved to the lessees the exclusive right to market the output of the oil, and it is plain from the instruments as a whole construed in the light of the circumstances of the parties, that it was contemplated that the lessees should have exclusive management of the development and subsequent conduct of the oil production enterprise. (See *Domestic & Foreign Petroleum Co.* v. *Long,* 4 Cal. (2d) 547, 555 [51 Pac. (2d) 73], where the assignments expressly provided that the grantors [lessees] or such persons as they might designate should be the only persons authorized to drill for or produce oil, and that the grantees should "not have any voice concerning said operations".)

If the effect of the percentage assignments was to create an undivided interest in the assignees in the leasehold estate, that is, in the right of profit to drill for and produce oil, notwithstanding it was understood that the lessees should retain exclusive management of the production enterprise, then as to such assignees the lessees are operating the well

as their agents, or in some representative capacity. If the lessees are thus operating the well, the problem suggests itself as to the personal liability to third persons of the percentage assignees for debts and liabilities of the production enterprise. No question as to such liability is involved in the instant case. The only question here presented is whether the holders of royalty assignments from the lessees have a claim upon the proceeds of oil produced by one to whom the lessees subsequently executed a transfer of the lease, in this case a sublease. Assignments by a lessee, like those by the lessor-landowner, are commonly referred to as royalty assignments, although they do not relate to royalty in the sense of rent due from a lessee to a lessor.

We are of the view that whether or not the royalty assignments in this case transferred to the holders thereof an interest in the leasehold, that is, in the profit à *prendre* to produce oil, in any event they vested in the holders a right to share in the proceeds of oil produced during the continuance of the lease by an assignee of the lease with notice. We prefer to place our decision on this ground without determining the question of interest in the leasehold estate as such, for the reason that a decision as to that matter might have important consequences as to problems such as that of liability under instruments of this type which are not directly presented in the instant case. Furthermore, there is some evidence in the instant case that the possibility of liability arising from an interest in the leasehold estate was present in the minds of plaintiff and another purchaser, and that it was the intent of the parties to so frame the instruments that they would transfer no interest in the leasehold estate, but only an interest in the oil or proceeds therefrom. In the discussion which follows it may be assumed for purposes of this decision that plaintiff does not have an interest in the leasehold estate as such.

In *Western Oil etc. Co.* v. *Venago Oil Corp., supra,* which like the instant case involved royalty assignments by a lessee, we held that assignments of percentages of oil "to be produced, saved and sold" under a lease constituted a present sale of future personalty, oil to be drawn from and severed from the realty. In 1931 the Uniform Sales Act was adopted in this state. (Stats. 1931, p. 2234.) Section 5 of said act abolishes the doctrine that there may be a so-called present

sale of future goods. It provides that where the parties purport to effect a present sale of future goods, the agreement operates as a contract to sell the goods. To this section of the act, the corresponding section of our code (sec. 1725, Civ. Code) adds the following: "and as soon as the seller acquires the goods the property therein shall pass to the buyer without further act if the parties so intend unless the agreement otherwise provides". We do not determine here the extent to which a lessee's royalty assignments executed after 1931 are subject to the provisions of the Uniform Sales Act regulating sales of ordinary personal property. Such assignments by reason of the unique and specialized nature of the interests involved must to a certain extent be *sui generis*. The royalty assignments in *Western Oil etc. Co.* v. *Venago Oil Corp., supra,* and in the instant case were executed prior to 1931. However, for the reason that the assignments in the instant case purport not to assign an undivided interest in the oil to be produced, as did the instruments in the above-cited case, but to assign a percentage of the proceeds from such oil, we prefer to place our decision on grounds which will be applicable alike to assignments of percentage interests in the oil to be produced or in the proceeds therefrom, and which do not use the terminology of the doctrine of potential possession.

The rights of the holders of royalty assignments to an interest in the proceeds of oil produced by an assignee of the leasehold should not depend on whether the assignment is of a percentage of the oil "to be produced, saved and sold", as in *Western Oil etc. Co.* v. *Venago Oil Corp., supra,* or is of a percentage of the net proceeds as in the instant case. Purchasers of royalty interests are generally investors who are not prepared to accept delivery of oil in kind, or to market their interest in the output of the well. Under the instruments in the Venago case assigning percentages of the oil to be produced, saved and *sold,* the lessee clearly had the right to market the oil, returning to the royalty holder a money payment. This likewise was the obligation of the lessees herein.

The holders of royalty interests from the lessee are not adequately protected unless they have a claim upon the proceeds of oil produced by one to whom the lessee has transferred the lease with notice of the royalty assignments. The

purchaser of royalty assignments makes a highly speculative investment. The well may never be brought into production, or may soon fail. In consideration of investing his funds in an enterprise with a high risk of total loss, the purchaser of a royalty interest receives an assignment of a percentage of the oil to be produced, or the proceeds therefrom, which is expressly, as in the Venago case, *supra,* or impliedly, as in the instant case, for the continuance of the lease. It is certainly not within the contemplation of the royalty holder that in addition to the other risks involved, the lessee may at any time terminate the royalty holder's interest by assigning the lease, and leave the royalty holder either remediless or with a claim for a share of the price received by the lessee for the transfer of the leasehold, or a claim for monetary damages. In view of the impossibility of estimating the life of the well, which may be for a long period of years, the amount of oil to be produced therefrom, and the market price over a long term, to give the royalty holder a present money claim in the event of an assignment of the lease manifestly would be inadequate. He has bargained for an interest in the oil produced during the term of the lease, or in the proceeds therefrom, and that is what he should receive. The law is not powerless to protect him during a lack of exact precedent.

The provision in the participating oil agreements held by plaintiff which gave the Monrovia Oil Company the exclusive right to sell the "oil or gas produced", did not confer on it the right to transfer the right to produce, free of claims of plaintiff and other holders of the agreements.

The subject-matter of royalty assignments is specific —an undivided interest in the oil to be produced under a specific lease or from a specific well during the term of the lease, or an interest in the proceeds of such oil. A transferee of the leasehold with notice on broad equitable principles must recognize the royalty holders' interest in oil produced by such transferee. The equitable doctrine of specific performance and equitable conversion as applied to contracts to buy and sell land, arose from the inadequacy of the remedy of damages due to the unique character of the subject-matter of the contract. In the case of royalty assignments the uncertainty in amount and value of the

oil to be produced renders the subject of the contract unique. In contracts relating to land the equitable conversion of title to the buyer and the remedy of specific performance may be asserted against a purchaser of the land with notice. Where royalty assignments are made by a lessee, the holders thereof have an interest in oil produced by an assignee of the leasehold covering the land from which the oil is to be produced who acquires the leasehold with notice, or in the proceeds thereof. The royalty assignee's interest in the proceeds must be upheld whether the assignment is of oil to be produced, saved and sold, or of proceeds of such oil. It is unnecessary here to decide whether the royalty assignee, before sale, has title to an undivided interest in the oil produced where the assignment is of a percentage of the proceeds, as in the instant case. In any event he has a claim for his share of the proceeds. ■ Personal covenants relating to land or an interest therein may be enforced in equity against a purchaser with notice where an action at law for damages will not do complete justice and it appears from the character and purpose of the contract that its performance was contemplated. (*Martin* v. *Holm,* 197 Cal. 733 [242 Pac. 718].)

■ All references in the findings, conclusions of law and judgment as to plaintiff having an undivided interest in the leasehold estate, that is, in the profit *à prendre* to produce oil, or in the oil produced prior to sale, are not necessary to the judgment and are hereby stricken out as surplusage. Plaintiff is entitled to receive his share of the proceeds from the defendant, as found by the trial court. As thus modified, the judgment is affirmed, appellant to bear costs on appeal.

Langdon, J., Curtis, J., Edmonds, J., Waste, C. J., and Shenk, J., concurred.

Rehearing denied.